**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------

KCG HOLDINGS, INC. and KCG      :     17 civ 3533 (AJN) (GWG)
AMERICAS LLC,      :
     :
              Plaintiffs,      :     **AMENDED COMPLAINT FOR**
     :     **INJUNCTIVE AND OTHER RELIEF**
        -against-      :
     :
ROHIT KHANDEKAR      :
     :
             Defendant.      :
     :

---------------------------------------------------------

Plaintiffs KCG Holdings, Inc. and KCG Americas LLC (collectively, "KCG"), by and through their undersigned attorneys, allege as follows for this Amended Complaint against Defendant Rohit Khandekar ("Khandekar"):

1.      KCG brings this action for violations of the Defend Trade Secrets Act of 2016, violations of New York state law regarding the misappropriation of trade secrets, breach of contract, and violations of the Computer Fraud and Abuse Act. Khandekar failed to comply with certain promises he made and obligations he owed to KCG, and violated federal and New York state law with respect to the use, retention, and disclosure of his former employer, KCG's, confidential and proprietary trade secrets. Specifically, on multiple occasions before his resignation from KCG and while he was interviewing (and ultimately accepted) a position with one of KCG's competitors, Khandekar:

- Wrote at least four different "scripts" - computer programs - which searched KCG's build server and personal directories of other KCG employees to identify the locations where proprietary trading models created by other KCG employees were stored;

- improperly and illegally accessed, used, reviewed and copied to locations under his control, proprietary trading models created by other KCG employees that he had no right to access, let alone review or copy;

- misappropriated proprietary KCG information by, inter alia, sending that information to his personal email address, in violation of company policy, his KCG employment agreement, and federal and New York state law;

- undertook these actions while actively interviewing for employment with one of KCG's competitors - a position which he accepted (but which offer has since been withdrawn); and

- prior to resigning from KCG, destroyed evidence and attempted to destroy evidence that he had accessed, reviewed, and copied KCG's proprietary information.

Khandekar's actions were undertaken in blatant disregard of his KCG employment agreement and KCG's employee guidelines, policies, and procedures, which specifically prohibited Khandekar from accessing, viewing and using certain proprietary information, and from sending KCG's proprietary information to personal email accounts. Khandekar's actions were not done in the performance of his duties for KCG, were done for an improper purpose, and risk the exposure of KCG's confidential trade secret information to the public and/or KCG's competitors. Further, it is highly probable, if not certain, that Khandekar inevitably will disclose KCG's proprietary information and trade secrets to KCG's competitors.

2.    Consequently, Khandekar violated federal and state protections against the misappropriation of trade secrets, as well as his KCG Employment Agreement, by accessing, reviewing, copying and using certain proprietary information, and sending KCG's confidential

information to his personal e-mail account.  KCG now seeks (a) injunctive relief enjoining Khandekar from using or disclosing KCG trade secrets and from engaging in the activities set forth in paragraph 3 of the WHEREFORE clause of this Amended Complaint; (b) an order for Khandekar to return all KCG's trade secrets in his possession, custody, or control to KCG; (c) an award of damages to KCG for his illegal and improper actions; (d) an award of a reasonable royalty to KCG for his misappropriation of KCG's highly confidential information and trade secrets; and (e) an award to KCG for its costs and expenses incurred in investigation and remediating Khandekar's unauthorized access and abuse of KCG's computer networks.

## THE PARTIES

3.      On or about July 20, 2017, KCG Holdings, Inc. merged with and into a subsidiary of Virtu Financial, Inc.  The surviving entity was reclassified into an LLC and renamed Virtu KCG Holdings LLC.

4.      KCG Holdings, Inc. was a Delaware Corporation with its principal place of business at 300 Vesey Street, New York, New York 10282.  Virtu KCG Holdings LLC is a Delaware Limited Liability Company with its principal place of business at 300 Vesey Street, New York, New York 10282.

5.      As a result of the merger, KCG Americas LLC's name was changed to Virtu Americas LLC.  KCG Americas, LLC was, and still is, a Delaware Limited Liability Company with its principal place of business at 300 Vesey Street, New York, New York 10282.

6.      Khandekar is a citizen of the State of New Jersey and resides at 1 2nd Street, Apartment 502, Jersey City, New Jersey 07302.

## JURISDICTION AND VENUE

7.     The Court has original jurisdiction pursuant to 28 U.S.C. § 1331, because this action involves a claim arising under the laws of the United States, the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, *et seq.,* and the Computer Fraud and Abuse Act Claim (18 U.S.C. § 1030, *et seq*.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendant are citizens of different states and the amount in controversy in this matter exceeds $75,000.00.  This Court also has supplemental jurisdiction over KCG's remaining claims pursuant to 28 U.S.C. § 1367 because all of KCG's claims are interrelated and form part of the same case or controversy.

8.     This Court has personal jurisdiction over Defendant because he was employed in KCG's New York office, and because the illegal actions that give rise to KCG's claims were committed by Defendant in New York, and because the parties have consented to jurisdiction in this Court

9.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to KCG's claims occurred in this District, and because the parties have consented to venue in this Court.

## **BACKGROUND**

10.     KCG engages in proprietary algorithmic trading and electronic market making. KCG electronically buys and sells financial instruments in several asset classes in order to provide two-sided markets on exchanges and trading platforms throughout the world.

11.     KCG's technology, which is highly confidential and proprietary, allows KCG to perform its business around the world and through exchanges and other trading platforms that are computer-based and accessed through computers.

12.     In addition to its technology, KCG's confidential information also includes, among other things, financial and business plans and strategies; client lists; economic, engineering and design information; software; algorithms; mathematical and valuation models; trading models and strategies; trading and hedging strategies and paradigms; and proprietary computer codes and computer and network hardware and configurations.

13.     KCG protects the confidential information described in paragraphs 11 and 12 by, among other things: limiting the disclosure and use of this information to only the KCG employees specifically authorized to use it; developing and implementing policies and procedures regarding the use and protection of confidential information; educating its employees about the requirements and necessity of keeping this information confidential; restricting access to this information by restricting access to computer networks and requiring the use of passwords to access the information; and requiring employees to execute written agreements that protect against the misuse and improper disclosure of KCG's confidential information. KCG developed this information at great expense, not only by paying highly trained professionals including developers, traders and quantitative analysts to develop its technology and trading models, but by investing substantial sums of money into developing its client relationships.

14.     Consequently, all KCG employees who have access to KCG confidential information agree to not access confidential information for which they are not authorized to access, to not disclose confidential information to anyone not authorized to receive it, to not use KCG confidential information for their own benefit or for any improper purpose, and to not remove KCG's electronic confidential and proprietary information from KCG's electronic systems.

**Khandekar's Employment with KCG**

15.     On or about April 2, 2012, a KCG predecessor entity hired Khandekar to be a Quantitative Strategist. On or about July 16, 2015, Khandekar signed an employment agreement which superseded any of his prior employment agreements with KCG. A copy of Khandekar 's KCG employment agreement ("Employment Agreement") is attached hereto as Exhibit "A."

16.     As a condition of his employment with KCG, and because he was entrusted with KCG's most important and confidential information, Khandekar expressly acknowledged and agreed that:

   a.  KCG is engaged in a diverse and evolving business and that the protection of KCG's confidential information, competitive advantages, and intellectual property is critical for its collective success and the stability of KCG's workforce;

   b.  KCG is relying on Khandekar to act with utmost fidelity and care to promote its interests;

   c.  In the course of his employment, Khandekar would learn of and/or have access to Confidential Information, as that term was defined in the Agreement;

   d.  KCG has expended considered efforts and costs to develop its Confidential Information and other intellectual property, and to keep that property secret; and

   e.  KCG derives competitive advantages from using its Confidential Information and Developments and that any loss or erosion of those advantages is likely to have adverse consequences to KCG's business.

*See* Exhibit "A" attached hereto at p. 1, ¶ 1.

17.     In addition to acknowledging his access to confidential information, Khandekar specifically agreed that such confidential information would include:

   financial, business, employee, technical, economic, engineering and design information, plans and strategies, forecasts, know-how, systems, processes, software, algorithms, mathematical models, valuation models, trading models or strategies, information relating to modeling relationships among interest rate market instruments, trading and hedging strategies and paradigms, firmware, trading technologies, the use of trading platform software (including all front-end, middleware and exchange connectivity components or subsystems and analysis and conclusions related to KCG's technology), proprietary computer code, and computer and network hardware and configurations.

*See* Exhibit "A" attached hereto at p. 5, ¶ 9(a).

18.     The information described in paragraph 17 is not generally known to the public, is

used in the operation of KCG's business, and has considerable commercial value for KCG.

19.     As a result of Khandekar's access to KCG's confidential information, and as a

condition of his continued employment with KCG, Khandekar agreed that while employed by

KCG, and at all times after his employment terminated for whatever reason, he would:

> a. Hold all KCG confidential information as a fiduciary in trust and use it only for the benefit of KCG in properly performing his employment duties for KCG;
>
> b. Maintain KCG confidential information in strict confidence and secrecy;
>
> c. Not, except as specifically directed by KCG in performing his employment duties for KCG, communicate or disclose confidential information in any manner to any person within or outside KCG who is not authorized to know of such confidential information, or use confidential information; and
>
> d. Comply with KCG's procedures on dealing with confidential information and in all events use his best efforts to prevent the inadvertent disclosure of confidential information.

*See* Exhibit "A" attached hereto at p. 5, ¶ 9(b).

20.     Khandekar also agreed that he would only access and use KCG's confidential

information in furtherance of his duties at KCG.  *Id.* at p. 5, ¶ 9(a). In other words, Khandekar

agreed that he would only use that confidential information which was related to the tasks he was

assigned at KCG, and that he was not permitted to access KCG's confidential information which

he was not specifically authorized to access.

21.     Khandekar also agreed to immediately return all KCG property upon the

termination of his employment with KCG, including any KCG confidential information in his

possession, custody, or control. *See* Exhibit "A" attached hereto at p. 6, ¶ 9(d).

22.    KCG employees, including Khandekar, each have access to a copy of KCG's Employee Handbook and Records Management Policy, both of which strictly prohibit employees from sending KCG's confidential and proprietary information to their personal email accounts.

23.    Khandekar also agreed that, if found in breach of any duty or obligation set forth in the Employment Agreement, including the duties and obligations he owed KCG with respect to KCG's confidential information, he would pay all costs and expenses, including attorneys' fees, which KCG incurred as a result of his breach. *See* Exhibit "A" attached hereto at p. 9, ¶ 13(d).

24.    Finally, Khandekar agreed that, in the event that he breached his Employment Agreement, KCG would be entitled to injunctive relief without posting a bond or security. *See* Exhibit "A" attached hereto at p. 8, ¶ 13(c).

### Khandekar's Exposure to KCG's Trade Secrets and Confidential Information

25.    KCG's Quantitative Strategists attempt to develop mathematical models that use information to *inter alia* forecast price movements in the securities markets ("Predictors").  The information used by the Predictors may include newspaper articles, public opinion polls, social media trends, trading volumes, exchange order book data, the prices of other securities, or theoretically any other piece of information.  The types of information, combinations of information and formulas used to create the forecasts are highly confidential.  The forecasts that the Predictors provide are used by the Firm to trade electronically.  The electronic trading industry is highly competitive and developing successful Predictors provides a competitive advantage worth millions of dollars annually.

26.    Khandekar was a Quantitative Strategist responsible - along with other KCG Quantitative Strategists - for developing and refining KCG's Predictors.  The Predictors that

Khandekar helped to develop, and had access to, at KCG are some of KCG's closely-guarded confidential and proprietary trade secrets. KCG maintains all of the Predictors developed by its Quantitative Strategists on its secure servers. Any employee with access to KCG's servers is required to sign an employment agreement containing a confidentiality clause, and information on the servers is password-protected. Moreover, the information on KCG's servers is segregated, with different levels of access for different employees. KCG's Quantitative Strategists are expected to only access the Predictors which they are specifically authorized to use.

27.     The U.S. Market-Making Business maintained a Departmental Directory on its servers within which employees could perform work and store information. Khandekar, like all other KCG Quantitative Strategists, had a personal directory kept on KCG's servers. The personal directory for each Quantitative Strategist is an electronic folder that is used as a workspace for the Quantitative Strategists to perform work and store information related to their work. Quantitative Strategists use their personal directories as a repository for the information used to complete their duties for KCG.

28.     In addition to a Departmental Directory that contained personal directories like those used by Khandekar, KCG also maintains other servers within which employees perform work and store information. One of those is the "build server," which is the computer facility that, among other things, is used to compile computer code into software that is usable by production systems. Quantitative Strategists also maintain personal folders on the build server within which they perform work and store information. At any given time, these personal folders on the build server may contain confidential computer codes including Predictors already developed by KCG.

29.     During his employment at KCG, Khandekar worked with Douglas Borden ("Borden"). Borden formerly held the position of Managing Director, Head of U.S. Client Strategies. In his position, Borden supervised teams of Quantitative Strategists in KCG's market-making business. Borden resigned from KCG on or about December 13, 2016, and is now employed by one of KCG's competitors, Two Sigma Investments, LP ("Two Sigma"). Upon information and belief, Borden did not actually begin working for Two Sigma until July 2017 because of certain non-compete obligations which he owed to KCG.

**Khandekar Improperly Accesses KCG's Trade Secrets and Confidential Information**

30.     On or about March 30, 2017, Khandekar resigned from KCG.

31.     On February 22, 2016 and November 10, 2016, Khandekar sent emails from his KCG work account to his personal email address containing proprietary research related to Predictors which he was developing at KCG. This was in direct violation of KCG's policies that strictly prohibits sending confidential and proprietary information offsite to a personal email account.

32.     On November 15, 2016, just five days after sending KCG's proprietary information to his personal email account, Khandekar submitted his resume to Two Sigma.

33.     In or about April 2017, KCG was conducting an investigation into the theft of trade secrets by former KCG employee Zhengquan Zhang. During the investigation of Zhang's activities, KCG discovered Predictors of other Quantitative Strategists stored in Khandekar's personal directory on KCG servers.

34.     Following the discovery of the Predictors of other Quantitative Strategists stored in Khandekar's personal directory and after his employment with KCG ended, KCG conducted an investigation into Khandekar's usage of and access to KCG's confidential and proprietary trade secret information.

35.    As part of its investigation, KCG discovered that Khandekar had improperly accessed and copied 160 Predictors written by other KCG employees.

36.    Specifically, Khandekar had written at least four different "scripts" - computer programs - which searched the personal directories of other Quantitative Strategists, as well as the personal directories of other Quantitative Strategists on the build server.  The scripts Khandekar created and ran scanned the build server and folders existing in other Quantitative Strategists' personal directories and workspaces, ultimately providing to Khandekar a list of the contents of the personal directories of other Quantitative Strategists on the build server and the personal directories of other Quantitative Strategists on the departmental directory.

37.    Khandekar then accessed the build server and other Quantitative Strategists' personal directories, and copied information from those directories to his personal directory. Specifically, Khandekar identified and accessed Predictors which other Quantitative Strategists had developed and were developing for KCG, and saved those copies to his personal directory.

38.    Khandekar was not authorized to access these Predictors and copy them to his personal directory.  KCG authorized access to Predictors by specifically designating the names of those authorized to access the code by listing their names as being recipients of encryption keys within the Predictor files.  Khandekar was not a designated encryption key recipient for the Predictors he copied.  Khandekar accessing the Predictor source code of other Quantitative Strategists in the manner that he did was contrary to KCG' policies and procedures and not authorized by KCG or the Quantitative Strategists whose Predictors he copied.

39.    A significant amount of the work done by Quantitative Strategists is researching which events correlate to changes in market pricing.  For instance, if KCG determines that the price of security X will go up or down when events A, B, and C occur (*i.e.*, "Signals"), KCG

creates mathematical formulas and computer code which allow its trading systems to take advantage of the correlations. KCG spends considerable time and effort researching the statistical correlations between events and developing methodologies utilizing the correlations to create price forecasts; thus, any individual with access to that information - including KCG's competitors - can see the end result of countless hours of research.

40.    Khandekar was not authorized to access the Predictors which he accessed and copied. Merely by accessing, reviewing and/or copying these Predictors, Khandekar could discover and memorize many of the ideas employed within the Predictors developed by other Quantitative Strategists. Given his skill level, having access to the work product of other Quantitative Strategists conveys a significant advantage to Khandekar in being able to take these ideas and create similar Predictors at Two Sigma or at any other KCG competitor.

41.    Khandekar accessed and used the Predictors to, *inter alia*, enhance his employment prospects at Two Sigma or another KCG competitor, and/or to enhance the compensation that Two Sigma would offer or did offer to him.

42.    In December 2016, and January, February, and March 2017, Khandekar accessed, reviewed and/or copied Predictors developed by other KCG employees contrary to KCG's stated policies and procedures. During this time period, Khandekar had applied for a position at Two Sigma and was engaged in the recruiting, interviewing, and hiring process with Two Sigma. Accordingly, Khandekar accessed, reviewed and/or copied Predictors developed by other KCG employees for reasons unrelated to KCG's business purposes, including, without limitation, to enhance his employment prospects at Two Sigma or another KCG competitor, and/or to enhance the compensation that Two Sigma would offer or did offer to him.

43.     On February 20, 2017, Khandekar met Borden for coffee.  While Borden had already accepted a position with Two Sigma, he was not scheduled to begin working until July 2017 because of his non-compete obligations to KCG.

44.     On February 22, 2017 - two days after Khandekar met with Borden - Khandekar accessed KCG's confidential information developed by other KCG Quantitative Strategists which he had copied on a prior occasion.

45.     On or about March 14, 2017, Khandekar submitted notice of his resignation to KCG.

46.     On March 29, 2017, KCG sent correspondence to Borden, demanding written confirmation under penalty of perjury that he had not solicited any KCG employee to resign his or her employment with KCG.  On March 31, 2017, Borden denied to KCG through counsel that he had solicited any KCG employee to resign his or her employment, but did not provide written confirmation under penalty of perjury as requested by KCG.

47.     Khandekar's last day of employment with KCG was March 30, 2017.

48.     In or about March 2017, just before the effective date of his resignation, Khandekar deleted a significant amount of information in his personal network directory including the scripts he wrote to copy the directories of other Quantitative Strategists, the output of those scripts, and the Predictors he had improperly accessed and copied.  He also deleted all of the information on his KCG issued laptop prior to returning it to KCG.

49.     In or about March 2017, Khandekar accepted a position with Two Sigma as its Head of Quantitative Signal Research.  In his new role, Khandekar was going to be developing the exact same types of Predictors as those used at KCG.  Upon information and belief,

Khandekar was scheduled to begin working for Two Sigma in October 2017 , but Two Sigma rescinded its offer of employment to Khandekar in or about mid-July 2017.

50.    The confidential and proprietary information which Khandekar accessed, reviewed and copied at KCG would be extremely valuable in the hands of a competitor like Two Sigma.  Upon information and belief, Khandekar intends to disclose KCG's confidential information and specifically the Predictors which he wrongfully accessed at KCG to any new employer who competes with KCG.

51.    Even if Khandekar does not intend to disclose KCG's confidential information to his new employer, whomever that may be, the fact that he will be working or will likely be working on the exact same types of Predictor makes his disclosure of KCG's confidential information regarding those Predictors inevitable.

**Agreed Preliminary Injunction**

52.    On or about June 28, 2017, the parties entered into a Stipulation in which they agreed, *inter alia*:

> While admitting no wrongdoing and without prejudice to any and all of his rights and defenses, Defendant and his agents, representatives, associates, employees, and all those acting in concert or participation with him shall (1) be enjoined and restrained from using, possessing or accessing any of Plaintiffs' confidential and proprietary information for any purpose; and (2) shall be enjoined and restrained from disclosing Plaintiffs' confidential and proprietary information to anyone not authorized by Plaintiffs to receive it; and (3) immediately return to Plaintiffs all of Plaintiffs' confidential and proprietary information and property in Defendant's possession, custody or control.

53.    The Court "So Ordered" the parties' June 28, 2017 Stipulation on June 29, 2017.

54.    KCG now seeks to prevent the further misuse and dissemination of its proprietary trade secret information and to recover all other and further remedies requested below.

**COUNT I**
**(Violation of Defend Trade Secrets Act of 2016)**
**(18 U.S.C. § 1832)**

55.     KCG repeats and re-alleges each and every allegation contained in paragraphs 1 through 54 of the Amended Complaint, as if fully set forth herein.

56.     During the course of his employment at KCG and in order to perform his duties on behalf of KCG, Khandekar was granted access to KCG's confidential and proprietary information.

57.     Khandekar had access to KCG's financial, business, employee, technical, economic, engineering and design information, plans and strategies, forecasts, know-how, systems, processes, software, algorithms, mathematical models, valuation models, trading models or strategies, information relating to modeling relationships among interest rate market instruments, trading and hedging strategies and paradigms, firmware, trading technologies, the use of trading platform software (including all front-end, middleware and exchange connectivity components or subsystems and analysis and conclusions related to KCG's technology), proprietary computer code, and computer and network hardware and configurations.

58.     This information is not available to the general public and is closely guarded by KCG.  KCG keeps such information strictly confidential in order to maintain an advantage in its highly competitive business.

59.     The information described above constitutes a protectable a trade secret under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 *et seq.*, because KCG derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.  18 U.S.C. § 1839.  As described, KCG's trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

60.     Khandekar improperly accessed KCG's highly confidential Predictors developed by other KCG employees.  Khandekar misappropriated KCG's trade secrets, as prohibited by the DTSA, because he knowingly acquired them by improper means, *i.e.*, he improperly accessed files which he knew he was not authorized to access at all.  18 U.S.C. § 1839(5)(A).

61.     Accordingly, KCG requests that this Court enter an order permanently enjoining Khandekar from using any KCG confidential information, from disclosing KCG confidential information to anyone not authorized to receive the confidential information, and enjoining Khandekar from engaging in the conduct set forth in Paragraph 3 of the WHEREFORE clause at the conclusion of this Amended Complaint.

62.     KCG also requests that this Court enter an order requiring Khandekar to return any and all KCG confidential information to KCG, as provided by 18 U.S.C. §1836(3)(A)(ii).

63.     KCG further requests an award of compensatory damages under 18 U.S.C. §1836(3)(B), exemplary damages under 18 U.S.C. §1836(3)(C), because Khandekar's misappropriation of KCG's trade secrets was willful and malicious, and attorney's fees under 18 U.S.C. §1836(3)(D).

64.     KCG also requests an award equal to a reasonable royalty for Khandekar's misappropriation of KCG's highly confidential information and trade secrets.

## COUNT II
### (Violation of Defend Trade Secrets Act of 2016)
### (18 U.S.C. § 1832)

65.     KCG repeats and re-alleges each and every allegation contained in paragraphs 1 through 64 of the Amended Complaint, as if fully set forth herein.

66.     In addition to misappropriating KCG's trade secrets by knowingly acquiring them by improper means, Khandekar also misappropriated KCG's trade secrets, in violation of the

DTSA, by using KCG's trade secrets without express or implied consent (after having used improper means to acquire knowledge of the trade secrets).  18 U.S.C. § 1839(5)(B).

67.     Khandekar reviewed KCG's trade secrets, copied them, and saved them to his personal directory, and sent KCG trade secrets to his personal, unsecured e-mail account, all in violation of his Employment Agreement and KCG policy and procedures.

68.     Under 18 U.S.C. § 1836(3), this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.

69.     Khandekar's illegal and wrongful accessing, reviewing and copying of KCG's confidential information, combined with his attempts to cover up his activities by deleting his personal directory and his acceptance of employment with KCG's competitor Two Sigma, constitutes the "threatened" misuse of KCG trade secrets.  Injunctive relief is therefore appropriate.

70.     Additionally, it is inevitable that Khandekar will use KCG's highly confidential information and trade secrets based on his knowledge and misappropriation of them as described herein.  Khandekar has already sought and received an offer of employment from one of KCG's competitors, Two Sigma, and upon information and belief is actively seeking employment with KCG's other competitors, at which the knowledge about KCG's highly confidential information and trade secrets that he purloined from KCG will inevitably be used by him to his and his new employer's advantage.

71.     Accordingly, KCG requests that this Court enter an order permanently enjoining Khandekar from using any KCG confidential information, from disclosing KCG confidential information to anyone not authorized to receive the confidential information, and enjoining

Khandekar from engaging in the conduct set forth in Paragraph 3 of the WHEREFORE clause at the conclusion of this Amended Complaint.

72.     KCG also requests that this Court enter an order requiring Khandekar to return any and all KCG confidential information to KCG, as provided by 18 U.S.C. §1836(3)(A)(ii).

73.     KCG further requests an award of compensatory damages under 18 U.S.C. §1836(3)(B), exemplary damages under 18 U.S.C. §1836(3)(C), because Khandekar's misappropriation of KCG's trade secrets was willful and malicious, and attorney's fees under 18 U.S.C. §1836(3)(D).

74.     KCG also requests an award equal to a reasonable royalty for Khandekar's misappropriation of KCG's highly confidential information and trade secrets.

**COUNT III**
**(Breach of Contract)**

75.     KCG repeats and realleges each and every allegation contained in paragraphs 1 through 74 of the Amended Complaint, as if fully set forth herein.

76.     On or about July 16, 2015, Khandekar entered into a valid and enforceable Employment Agreement with KCG a true and correct copy of which is attached hereto as Exhibit "A."

77.     Under the terms of his Employment Agreement, Khandekar promised to:

    a.  Hold all KCG confidential information as a fiduciary in trust and use it only for the benefit of KCG in properly performing his employment duties for KCG;

    b.  Maintain KCG confidential information in strict confidence and secrecy; and

    c.  Comply with KCG's procedures on dealing with confidential information and use his best efforts to prevent the inadvertent disclosure of confidential information.

*See* Exhibit "A" attached hereto at p. 5, ¶ 8(b).

78.     KCG has performed all of its duties and obligations under both Khandekar's employment agreements.

79.     Khandekar breached his KCG Employment Agreement by writing computer code to search KCG's systems for confidential information, and ultimately illegally and wrongfully accessed, reviewed, copied and/or used KCG's confidential information being developed by other Quantitative Strategists - confidential information which Khandekar was not authorized to access as part of his duties at KCG.

80.     Khandekar further breached his KCG employment agreement by sending KCG's confidential and proprietary trade secrets to his personal email account in February of 2016 and November of 2016.

81.     Khandekar's breaches of his KCG employment agreements have harmed KCG by placing KCG's most confidential and proprietary trade secret information at risk of disclosure to the public and/or KCG's competitors. The disclosure of KCG's confidential and proprietary trade secrets to the public or its competitors would allow KCG's competitors to unfairly compete with it, and destroy the commercial value of any such models. Specifically, in the highly competitive industry in which KCG operates, the disclosure of its Predictors would allow a competitor to unfairly compete with KCG.

82.     The loss of its confidential and proprietary trade secret information would subject KCG to continuing irreparable harm.  Unless injunctive relief is granted, KCG will continue to be irreparably harmed by Khandekar's actions.

83.     KCG therefore requests that this Court grant permanent injunctive relief against Khandekar prohibiting him both from using and/or disclosing KCG's trade secrets, including but not limited to all of KCG's trade secrets that he sent to his personal email accounts, and the 160

Predictors he accessed, copied and/or viewed; and ordering Khandekar to return all of KCG's

trade secrets in his or his agents' possession, custody, or control to KCG; and grant injunctive

relief against Khandekar prohibiting him from engaging in the conduct set forth in Paragraph 3

of the WHEREFORE clause at the conclusion of this Amended Complaint.

84.    KCG also requests all monetary damages caused by Khandekar's breaches of his

KCG employment agreements.  KCG is also entitled to recover its attorneys' fees and costs from

Khandekar as a result of his breaches of his KCG employment agreements,

**COUNT IV**
**(Misappropriation of Trade Secrets)**

85.    KCG repeats and re-alleges each and every allegation contained in paragraphs 1

through 84 of the Amended Complaint, as if fully set forth herein.

86.    During the course of his employment at KCG and in order to perform his duties

on behalf of KCG, Khandekar was granted access to KCG's confidential and proprietary

information.

87.    Khandekar had access to:  financial, business, employee, technical, economic,

engineering and design information, plans and strategies, forecasts, know-how, systems,

processes, software, algorithms, mathematical models, valuation models, trading models or

strategies, information relating to modeling relationships among interest rate market instruments,

trading and hedging strategies and paradigms, firmware, trading technologies, the use of trading

platform software (including all front-end, middleware and exchange connectivity components

or subsystems and analysis and conclusions related to KCG's technology), proprietary computer

code, and computer and network hardware and configurations.

88.    This information is not available to the general public and is closely guarded by KCG.  KCG keeps such information strictly confidential in order to maintain an advantage in the highly competitive high frequency trading business.

89.    This information is considered a trade secret under New York state law because KCG derives an advantage over its competitors from the information, the information is not known outside of KCG, KCG has expended considerable amounts of money in developing the information, the information derives independent economic value from this information not being generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy.

90.    This information has been continually used in KCG's business, and is currently being used in KCG's business.

91.    The economic value of the KCG trade secrets/confidential information Khandekar had access to under his Employment Agreements is substantial.

92.    The emails sent by Khandekar to his personal email account contain information which constitutes protectable trade secrets under New York state law.

93.    The information improperly and illegally accessed, reviewed and copied by Khandekar through the use of the computer programs which he wrote constitute protectable trade secrets under New York state law.

94.    Khandekar misappropriated KCG trade secrets when he used them by, *inter alia*, (1) accessing them through the computer scripts, and subsequently reviewing and copying them in breach of his confidentiality obligations set forth in his Employment Agreement with KCG and in violation of KCG policy and procedures, and (2) using KCG trade secrets to enhance his

employment prospects at Two Sigma or another KCG competitor, and/or to enhance the compensation that Two Sigma would offer or did offer to him.  Khandekar also misappropriated KCG's trade secrets by sending confidential information to his personal devices and platforms, including but not limited to his personal email address on at least two separate occasions, in breach of his confidentiality obligations set forth in his Employment Agreement with KCG and in violation of KCG policy and procedures.

95.     Under New York state law, this Court may grant injunctive relief to prevent any actual or threatened misappropriation of trade secrets.

96.      There has been an actual misappropriation of KCG's trade secrets by Khandekar because, *inter alia*, he used them by sending highly sensitive KCG information and trade secrets to his personal email accounts in direct violation of his employment agreements and KCG policy and procedures, and used KCG trade secrets to enhance his employment prospects at Two Sigma or another KCG competitor, and/or to enhance the compensation that Two Sigma would offer or did offer to him.

97.     Further, Khandekar's illegal and wrongful accessing, reviewing and copying of KCG's confidential information through computer scripts, combined with his attempts to cover up his activities by deleting his personal directory and his acceptance of employment with KCG's competitor Two Sigma (since rescinded), constitutes the "threatened" misuse of KCG trade secrets.  Permanent injunctive relief is therefore appropriate.

98.     Additionally, it is inevitable that Khandekar will use KCG's highly confidential information and trade secrets based on his knowledge and misappropriation of them as described herein.  Khandekar has already sought and received an offer of employment from one of KCG's competitors, Two Sigma, and upon information and belief is actively seeking employment with

KCG's other competitors, at which the knowledge about KCG's highly confidential information and trade secrets that he purloined from KCG will inevitably be used by him to his and his new employer's advantage.

99.     Accordingly, KCG requests that this Court enter an order permanently enjoining Khandekar from using any KCG confidential information; from disclosing KCG confidential information to anyone not authorized to receive the confidential information; and enjoining Khandekar from engaging in the conduct set forth in Paragraph 3 of the WHEREFORE clause at the conclusion of this Amended Complaint.

100.     KCG also requests that this Court enter an order requiring Khandekar to return any and all KCG confidential information to KCG.

101.     KCG further requests an award of compensatory damages, attorneys' fees pursuant to Khandekar's employment agreement, and exemplary damages because Khandekar's misappropriation of KCG trade secrets was willful and malicious.

102.     KCG also requests an award equal to a reasonable royalty for Khandekar's misappropriation of KCG's highly confidential information and trade secrets.

## COUNT V
### (Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030)))

103.     KCG repeats and re-alleges each and every allegation contained in paragraphs 1 through 102 of the Amended Complaint, as if fully set forth herein.

104.     Khandekar knowingly and intentionally accessed KCG's computers without authorization or in excess of his authorization.

105.     At the time Khandekar was hired by KCG, he specifically acknowledged, as evidenced by his signature to his Employment Agreement that: "KCG is engaged in a diverse and evolving business and that the protection of its confidential information, competitive

advantages and intellectual property is critical for its collective success and the stability of KCG's workforce." Employment Agreement ¶ 1(a) (Exhibit "A"). Furthermore, he acknowledged in the same agreement that: "KCG has expended considerable efforts and costs to develop its Confidential Information and other intellectual property, and to keep that information secret." Employment Agreement ¶ 1(d) (Exhibit "A").

106. Khandekar also explicitly agreed, by signing the Employment Agreement, not to access any files, other than as authorized to perform his job duties, without clearance from KCG. Employment Agreement ¶ 11(b) (Exhibit "A") ("I will not use a code, access a file or retrieve any stored communication, other than as authorized by KCG to perform my job duties, without prior clearance from KCG.").

107. Furthermore, Khandekar, as a sophisticated quantitative analyst with years of experience in the industry, is aware of the restrictions surrounding trade secrets and proprietary information, and the limits on authorized access to such information within companies.

108. By running scripts to search KCG's build server and the personal directories of other KCG employees to identify proprietary trading models created by other KCG employees, which he was not authorized to access, Khandekar improperly and illegally accessed, reviewed and copied proprietary trading models created by other KCG employees that he had no right or authorization to access. He did this notwithstanding his awareness of KCG policy and procedures regarding unauthorized access to information.

109. Khandekar's unauthorized access of KCG's computers was for the purpose of acquiring information, including trade secrets such as Predictors, from those computers, for his own personal gain and/or for the benefit of competitors of KCG, including Two Sigma.

110.    In response to learning of the unauthorized access by Khandekar of trade secrets including Predictors hosted on the KCG computers, KCG was compelled to conduct an investigation using internal and external resources regarding this unauthorized access.  This investigation and remediation utilized and continues to utilize significant KCG resources, including the cost of investigation and remediation and the time and attention of senior executives.

111.    As a result of the unauthorized access and abuse of its computer network, including the subsequent investigation and remediation, KCG was damaged by Khandekar's actions in an amount to be proven at trial that is well in excess of $5,000.

112.    The KCG computers accessed by Khandekar are "protected computers" engaged in and affecting interstate commerce.

113.    KCG also requests that this Court grant permanent injunctive relief against Khandekar prohibiting both him from using and/or disclosing KCG's trade secrets, including all of KCG's trade secrets sent to his personal email accounts; and ordering Khandekar to return all of KCG's trade secrets in his or his agents' possession, custody, or control to KCG; and grant injunctive relief against Khandekar prohibiting him from engaging in the conduct set forth in Paragraph 3 of the WHEREFORE clause at the conclusion of this Amended Complaint.

**WHEREFORE**, Plaintiffs KCG Americas LLC and KCG Holdings, Inc. respectfully request that this Court:

1. Enter an Order permanently enjoining Defendant, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him (including any agents, representatives, associates and/or employees), from disclosing any of KCG's trade secrets or other confidential or proprietary information to anyone not authorized to receive it;

2. Enter an Order permanently enjoining Defendant, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him (including any agents, representatives, associates and/or employees), from using, possessing, or having access to KCG's confidential and proprietary information;

3. Enter an Order permanently enjoining Defendant, and all persons and/or entities acting on his behalf, for his benefit, or in active concert or participation with him (including any agents, representatives, associates and/or employees), from developing models designed to forecast future price movements in financial instruments using statistical analysis methodologies and data sets that include order, trade, news, social media and similar types of data, for his own use or use by any competitors of KCG to engage in market making activities, and enjoining KCG's competitors engaged in market making activities from employing Defendant to develop or supervise persons developing such models to engage in market making activities.

4. Enter an Order requiring Defendant to immediately return all of KCG's confidential trade secret information in his possession, custody or control to KCG;

5. Award KCG monetary damages resulting from the breaches of Khandekar's breaches of his Employment Agreement, and the costs and expenses, including reasonable attorneys' fees, that KCG incurs as a result of Khandekar's breaches of his Employment Agreement;

6.     Award KCG a reasonable royalty for Khandekar's misappropriation of KCG's highly confidential information and trade secrets;

7.     Award KCG the costs and expenses that KCG incurred in connection with its investigation and remediation of Khandekar's violation of the Computer Fraud and Abuse Act;

8.     Award KCG all other monetary damages requested herein; and

9.     Award KCG such other relief as the Court may deem just and proper.

Dated: New York, New York
       August 25, 2017

BAKER & MCKENZIE LLP

By: */s/Robert P. Lewis*
     Robert P. Lewis (RL 6321)
     William H. Devaney (WD 0563)
     William D. Dugan (admitted *pro hac vice*)

     452 Fifth Ave.
     New York, NY 10018
     Telephone: (212) 891-3532
     Fax:  (212) 310-1632
     Email:  robert.lewis@bakermckenzie.com

     Attorneys for Plaintiffs KCG Americas LLC and KCG Holdings, Inc.