EXHIBIT I

ROTTENBERG LIPMAN RICH, P.C.

NEW JERSEY OFFICE
PARK 80 WEST, PLAZA ONE
250 PEHLE AVENUE, SUITE 101
SADDLE BROOK, NEW JERSEY 07663
TELEPHONE (201) 490-2022
TELECOPIER (201) 490-2040

THE HELMSLEY BUILDING
230 PARK AVENUE
EIGHTEENTH FLOOR
NEW YORK, NEW YORK 10169
TELEPHONE (212) 661-3080
TELECOPIER (212) 867-1914

WWW.RLRPCLAW.COM

HARRY W. LIPMAN
MEMBER
HLIPMAN@RLRPCLAW.COM

October 2, 2017

**VIA Email**

William Dugan, Esq.
Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018

> Re:   <u>KCG Holdings, Inc. Restricted Stock Unit Agreements</u>

Dear Bill:

As you know, we represent Rohit Khandekar.  During his employment with KCG Holdings, Inc. and/or KCG Americas LLC (together, "KCG"), Mr. Khandekar participated in the KCG Holdings, Inc. Amended and Restated Equity Incentive Plan (the "Plan"; Attachment 1). Under the Plan, KCG granted Mr. Khandekar 15,664 Restricted Stock Units ("RSUs"), of which 10,270 remained unvested upon KCG's merger (the "Merger") with Virtu Financial, Inc, Virtu Americas LLC, and/or Virtu KCG Holdings, LLC (together, "Virtu") pursuant to certain Restricted Stock Unit Agreements (the "Agreements"; Attachment 2).   Shortly before the Merger, the following message appeared on Mr. Khandekar's e-Trade account, which managed the RSUs:

> Message from your company:  In anticipation of the closing of the merger with Virtu on July 20, 2017, the Closing, You [sic] should download any information that will help you determine the cost basis for your transactions.  You will have access to your account after the close.  RSUs: As of the Closing, your RSUs will cancel.  <span style="color:red">A cash payment will be made through KCG payroll equal to the number of unvested RSUs at Closing multiplied by the deal price of 20.  You will receive this payment (less applicable tax withholdings) on July 25, 2017 in the US and July 24, 2017 in the UK</span>…Note the statement in <span style="color:red">red</span>.

According to this message Mr. Khandekar should have received a cash payment of $205,400 on July 25, 2017 in exchange for his 10,270 unvested RSUs.  Instead, KCG and/or Virtu eliminated Mr. Khandekar's unvested RSUs without issuing him any cash payment or explanation. Upon information and belief, KCG and/or Virtu did so based on their erroneous conclusion that Mr. Khandekar violated his confidentiality and proprietary information obligations to KCG, as alleged in the federal action that KCG initiated against Mr. Khandekar in May 2017 (the "Federal Action").  Please let us know immediately if that belief is mistaken.

ROTTENBERG LIPMAN RICH, P.C.
October 2, 2017
Page 2


By letter dated August 4, 2017 from Virtu's counsel (Attachment 3), Virtu demanded pursuant to the Plan that Mr. Khandekar remit $199,998.11 to Virtu, representing the value of the stock awards he was paid in the past. As Virtu's counsel clarified by email on August 8, 2017 (Attachment 4), copying KCG's counsel in the Federal Action, the basis for Virtu's demand was Mr. Khandekar's alleged violation of his confidentiality and proprietary information obligations. As we made clear in our letter dated August 14, 2017 (Attachment 5), Mr. Khandekar engaged in no wrongful conduct whatsoever, much less any conduct that would trigger a forfeiture of Mr. Khandekar's unvested RSUs or a "recapture" event allowing KCG and/or Virtu to recapture Mr. Khandekar's vested RSUs.

Therefore, we demand that KCG and/or Virtu immediately pay Mr. Khandekar his cash payment of $205,400 for his 10,270 unvested RSUs, and withdraw any demand for recapture of Mr. Khandekar's vested RSUs by the close of business tomorrow, October 3, 2017.

This letter is without prejudice to Mr. Khandekar's rights, all of which are expressly reserved.

Very truly yours,

Harry W. Lipman

cc:    Jacob Kaplan, Esq.
       William Devaney, Esq.
       Robert Lewis, Esq.
       Juliet Hatchett, Esq.
       Catherine Muir, Esq.

Attachments

**KCG HOLDINGS, INC.**
**AMENDED AND RESTATED EQUITY INCENTIVE PLAN**

**ARTICLE 1**
**PURPOSE AND EFFECTIVENESS**

1.1     Purpose. The purpose of the KCG Holdings, Inc. Amended and Restated Equity Incentive Plan (the "Plan") is to (1) attract, retain and motivate officers, employees and directors of the Company (as defined below), (2) compensate officers, employees and directors of the Company by providing a method whereby such officers, employees, and directors are encouraged to increase their proprietary interest in the Company and (3) promote the long-term financial interest of the Company by aligning the interests of officers, employees and directors with those of Company shareholders.

1.2     Prior Plans.  The Plan was originally assumed by the Company from The Knight Capital Group, Inc. on July 1, 2013 and, prior to such assumption, had replaced the Knight Capital Group, Inc. 2006 Equity Incentive Plan, the Knight Capital Group, Inc. 2003 Equity Incentive Plan, the Knight Capital Group, Inc. 1998 Long-Term Incentive Plan and the 1998 Non-Employee Director Stock Option Plan (together, the "Prior Plans") for Awards granted on or after May 12, 2010.  No Awards may be granted under the Prior Plans and the Plan will not affect the terms or conditions of any Awards granted under the Prior Plans prior to May 12, 2010.

1.3     Effective Dates and Stockholder Approval.  The Plan was amended and restated as the KCG Holdings, Inc. Amended and Restated Equity Incentive Plan by the Board on November 18, 2013, subject to the approval by the shareholders of the Company, which was obtained on December 19, 2013 (the "Effective Date").  The Plan was further amended and restated as the KCG Holdings, Inc. Amended and Restated Equity Incentive Plan by the Board on April 1, 2015, subject to the approval by the shareholders of the Company, which was obtained on May 12, 2015.

1.4     Term of Plan.   The Plan shall be unlimited in duration and, in the event of Plan termination, shall remain in effect as long as any Awards under it are outstanding; provided, however, that no Awards may be granted under the Plan after December 19, 2023; provided, further, that no Awards (other than an Option or Stock Appreciation Right) that are intended to be "performance-based" under Section 162(m) of the Code shall be granted based on the Performance Factors (as defined in Section 12.1) on or after the first stockholder meeting that occurs in the fifth year following the year in which stockholders previously approved the Performance Factors unless the Performance Factors are reapproved (or other designated performance goals are approved) by the stockholders on or before such stockholder meeting.

1.5     Forms of Awards. Awards made under the Plan may be in the form of Incentive Options, Nonqualified Options, Stock Appreciation Rights, Restricted Shares, Restricted Stock Units, Other Stock-Based Awards and Cash-Based Awards, all as the Committee in its sole discretion shall decide. The terms and conditions of any Award to any Participant shall be reflected in such form of written or electronic document as is determined by the Committee. A copy of such document shall be provided to the Participant, and the Committee may, but need not, require that the Participant sign a copy of such document; provided, however, that the Participant may sign a copy of such document through an electronic grant notification system maintained by or on behalf of the Company.

## ARTICLE 2
## DEFINITIONS

Capitalized terms not defined elsewhere in the Plan shall have the following meanings (whether used in the singular or plural):

2.1    **"Agreement"** means a written agreement between a Participant and the Company which sets out the terms of the grant of an Award, as any such Agreement may be supplemented or amended from time to time. Any reference herein to an Agreement in writing shall be deemed to include an electronic writing to the extent permitted by applicable law.

2.2    **"Award"** means any Option, Stock Appreciation Right, Restricted Share, Restricted Stock Unit, Other Stock-Based Award or Cash-Based Award granted under the Plan.

2.3    **"Board"** means the Board of Directors of the Company.

2.4    "**Cash-Based Award**" means an Award granted pursuant to Article 11.

2.5    "**Cause**" means (A) the meaning given to such term in any employment agreement, severance agreement, change in control agreement or similar agreement with the Company to which such Participant is party, (B) a felony conviction of the Participant, (C) the commission by the Participant of an act of fraud or embezzlement against the Company, (D) the Participant's willful misconduct or gross negligence materially detrimental to the Company, (E) the Participant's wrongful dissemination or use of confidential or proprietary information, (F) the intentional and habitual neglect by the Participant of his duties to the Company or (G) as otherwise defined in the applicable Agreement.

2.6    "**Change-In-Control**" means the first to occur of:

(i)    the acquisition by any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act ) of "beneficial ownership" (within the meaning of Rule 13d-3 of the Exchange Act), directly or indirectly, of securities of the Company representing thirty-five percent or more of either the then-outstanding Shares or the combined voting power of the Company's then-outstanding voting securities entitled to vote generally in the election of directors; provided, however, that for purposes of this subsection (i), the following transactions shall not constitute a Change-In-Control: (A) an acquisition by the Company, (B) an acquisition by any employee benefit plan (or related trust) sponsored or maintained by the Company, (C) an acquisition by an entity owned, directly or indirectly, by the stockholders of the Company in substantially the same proportions as their ownership of Shares, (D) an acquisition by an entity pursuant to a Business Combination (as defined in subsection (iii) of this Section 2.6) that satisfies clauses (A), (B) and (C) of such subsection or (E) any acquisition directly from the Company;

(ii)    the following individuals cease for any reason to constitute a majority of the Company's Directors then serving: individuals who as of the

2

Effective Date constitute the Board (the "Initial Directors") and any new Director (a "New Director") whose appointment or election by the Board or nomination for election by the Company's stockholders was approved or recommended by a vote of at least two-thirds of the Directors then in office who either are Initial Directors or New Directors; provided, however, that a Director whose initial assumption of office is in connection with an actual or threatened election contest (including but not limited to a consent solicitation) relating to the election of Directors of the Company shall not be considered a New Director;

(iii)    the occurrence or consummation of a reorganization, merger or consolidation or a sale or disposition of all or substantially all of the Company's assets (a "Business Combination"), other than a Business Combination in which (A) the voting securities of the Company outstanding immediately prior thereto and entitled to vote generally in the election of directors continue to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or any parent thereof) more than fifty percent of the combined voting power of the voting securities of the Company or such surviving entity or parent outstanding immediately after such Business Combination and entitled to vote generally in the election of directors; (B) no "person" (as hereinabove defined), other than the Company, an employee benefit plan (or related trust) sponsored or maintained by the Company, or an entity resulting from such Business Combination, acquires more than thirty-five percent of the combined voting power of the Company's then-outstanding securities entitled to vote generally in the election of directors, and (C) at least a majority of the members of the board of directors of the entity resulting from such Business Combination were Initial Directors or New Directors at the time of the execution of the initial agreement, or action of the Board, providing for such Business Combination; or

(iv)    the stockholders of the Company approve a plan of complete liquidation or dissolution of the Company.

2.7    **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, or any successor statute or statutes thereto, and any rules or regulations promulgated thereunder. Reference to any specific Code section shall include any successor section.

2.8    **"Committee"** means the Compensation Committee of the Board or such other committee of the Board designated by the Board to administer the Plan.

2.9    **"Company"** means KCG Holdings, Inc. (including its predecessor Knight Capital Group, Inc.) and any of its Subsidiaries and affiliates and any successor entity thereto.

2.10    **"Covered Employee"** means an Employee whose compensation is subject to the potential tax deduction disallowance provisions of Section 162(m) of the Code and such other Employees designated as such by the Company.

3

2.11   **"Date of Grant"** means the date on which the Committee determines the terms of an Award to a specified Participant, including, the number of Shares subject to the Award and, in the case of an Option or a Stock Appreciation Right, the applicable Exercise Price.

2.12   **"Director"** means a duly elected member of the Board.

2.13   "**Disqualifying Disposition**" means any disposition of the Shares acquired on exercise of an Incentive Option before the later of (a) two years after the Date of Grant of the Incentive Option or (b) one year after the date the Participant acquired Shares by exercising the Incentive Option, other than a transfer (i) from a decedent to an estate, (ii) by bequest or inheritance, (iii) pursuant to a tax-free corporate reorganization, or (iv) to a spouse or incident to divorce.  Any transfer of ownership to a broker or nominee shall be deemed to be a disposition unless the Participant provides proof satisfactory to the Committee of his continued beneficial ownership of the Shares.

2.14   **"Employee"** means an employee of the Company (including a prospective employee of the Company).

2.15   **"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor statute or statutes thereto, and any rules or regulations promulgated thereunder. Reference to any specific Exchange Act section shall include any successor section.

2.16   **"Exercise Price"** means the price that must be paid by a Participant upon exercise of an Option to purchase a Share, or in the case of a Stock Appreciation Right, the price against which the stock price appreciation is measured.

2.17   "**Fair Market Value**" means, with respect to a Share, the average of the high and low sales price on the principal exchange or market on which the Share is then listed for the last preceding date on which there was a sale of such Share on such exchange or market, unless determined otherwise by the Committee.

2.18   "**Good Reason**" means the meaning given to such term in any employment agreement, severance agreement, change in control agreement or similar agreement with the Company (if any) to which such Participant is party.

2.19   **"Incentive Option"** means an option granted pursuant to Section 6.3 that is both intended to qualify and qualifies as an "incentive stock option" under Section 422 of the Code.

2.20   **"Nonqualified Option"** means an option granted pursuant to Article 6 that either is not intended to be or is not denominated as an Incentive Option, or that does not qualify as an "incentive stock option" under Section 422 of the Code.

2.21   **"Option"** means a Nonqualified Option or an Incentive Option granted pursuant to Article 6.

2.22   "**Other Stock-Based Award**" means an award granted pursuant to Article 10.

4

2.23    **"Participant"** means an Employee or Director who has received or is eligible to receive an Award under the Plan.

2.24    **"Plan"** means this KCG Holdings, Inc. Amended and Restated Equity Incentive Plan, as amended from time to time.

2.25    "**Restricted Share**" means a Share granted pursuant to Article 8 that is subject to such terms and conditions as determined by the Committee at the time of grant, including, without limitation, vesting or non-transferability restrictions.

2.26    "**Restricted Stock Unit**" means a restricted stock unit granted pursuant to Article 9 that is subject to such terms and conditions as determined by the Committee at the time of grant, including, without limitation, vesting or non-transferability restrictions.

2.27    **"Securities Act"** means the Securities Act of 1933, as amended from time to time, or any successor statute or statutes thereto, and any rules or regulations promulgated thereunder. Reference to any specific Securities Act section shall include any successor section.

2.28    **"Shares"** mean shares of Common Stock, $0.01 par value per share, of the Company.

2.29    **"Stock Appreciation Right"** means a right, granted pursuant to Article 7, to receive upon exercise of such right before a specified date, in cash or Shares (or a combination thereof) as determined by the Committee, an amount equal to the increase in Fair Market Value of a specified number of Shares over the Exercise Price of such Stock Appreciation Right.

2.30    **"Subsidiary"** of the Company means any present or future subsidiary (as that term is defined in Section 424(f) of the Code) of the Company. An entity shall be deemed a Subsidiary of the Company for purposes of this definition only for such periods as the requisite ownership or control relationship is maintained.

2.31    **"Termination of Service"** occurs when a Participant ceases to be an Employee of, or ceases to provide services as a Director to, the Company, as the case may be, for any reason; provided, however, with respect to any Award subject to Section 409A of the Code (and not exempt therefrom), a Termination of Service occurs when a Participant experiences a "separation from service" (as such term is defined under Section 409A of the Code).

## ARTICLE 3
## ADMINISTRATION

3.1    Administration. The Plan shall be administered by the Committee.  The Committee is authorized, subject to the provisions of the Plan, to establish such rules and regulations as it deems necessary for the proper administration of the Plan and to make such determinations and interpretations and to take such action in connection with the Plan and any Award as it deems necessary or advisable.  All determinations and interpretations made by the Committee will be final, binding and conclusive on all Participants and on their legal representatives and beneficiaries.  The Committee will have the authority, in its absolute discretion, to determine the persons who will receive Awards, the time when Awards will be granted, the terms of such Awards and the number of

5

Shares, if any, which will be subject to such Awards.  Unless otherwise provided in an Agreement, the Committee reserves the authority, in its absolute discretion, (a) to amend any outstanding Agreement in any respect, whether or not the rights of the Participant of such Award are adversely affected (but subject to Article 13 and Section 162(m) of the Code, to the extent applicable), including, without limitation, to accelerate the time or times at which the Award becomes vested or unrestricted or may be exercised, to waive or amend any restrictions or conditions set forth in such Agreement, or to impose new restrictions and conditions, or to reflect a change in the Participant's circumstances or to modify, amend or adjust the terms and conditions of performance goals, and (b) to determine whether, to what extent and under what circumstances and method or methods (i) Awards may be (A) settled in cash, Shares, other securities, other Awards or other property (or combination thereof), (B) exercised or (C) canceled, forfeited or suspended, (ii) Shares, other securities, other Awards or other property, and other amounts payable with respect to an Award may be deferred either automatically or at the election of the Participant thereof or of the Committee and (iii) Awards may be settled by the Company or any of its designees.  Notwithstanding anything to the contrary contained herein, the Board may, in its sole discretion, at any time and from time to time, grant Awards or administer the Plan, in which case the Board will have all of the authority and responsibility granted to the Committee herein, subject to the requirements of applicable law and the Code.

3.2     <u>Delegation by Committee</u>. Except to the extent prohibited by applicable law, the Code or the applicable rules of a stock exchange, the Committee may delegate to any person or persons selected by it, who may or may not be Directors, all or any part of its responsibilities and powers as set forth above. In making such allocation or delegation, the Committee will consider the extent to which any delegation may cause Awards to fail to be deductible under Section 162(m) of the Code or to fail to meet the requirements of Rule 16(b)-3(d)(1) or Rule 16(b)-3(e) under the Exchange Act. Any such allocation or delegation may be revoked by the Committee at any time.

3.3     <u>Liabilities and Indemnification</u>. No Employee or Director shall be personally liable for any action, determination or interpretation made in good faith with respect to the Plan or any Award granted pursuant thereto. Each Employee and Director shall be indemnified and held harmless by the Company against any cost or expense (including counsel fees) reasonably incurred by him or liability (including any sum paid in settlement of a claim with the approval of the Company) arising out of any act or omission to act in connection with the Plan, unless arising out of such Employee's or Director's own fraud, bad faith or willful misconduct. Such indemnification shall be in addition to any rights of indemnification the Employee or Director may have under the certificate of incorporation and/or by-laws of the Company, as a matter of law, or otherwise, or any other power the Company may have to indemnify such persons or hold them harmless. The foregoing right of indemnification shall not apply to the actions, determinations or interpretations made by an individual with regard to Awards granted to him or her under the Plan.

3.4     <u>Compliance as an SEC Registrant</u>. During any period in which the Company has issued and outstanding any class of common equity securities which is registered under Section 12 of the Exchange Act, the Committee shall be comprised of not less than two persons each of whom qualifies as:  (i) a "non-employee director" within the meaning of Section 16(b) of the Exchange Act, and (ii) an "independent director" as defined under New York Stock Exchange Section 303A.02 or such other applicable stock exchange rule.  To the extent that the Board determines it appropriate for the compensation realized from Awards to be considered "performance-based compensation" under Section 162(m), the

SC1:3811746.5

Committee shall be composed of two or more members, each of whom is an "outside director" within the meaning of Section 162(m) of the Code; provided that nothing in this Plan shall be construed to require the Committee or the Board to grant Awards that satisfy the requirements of Section 162(m) of the Code.  If for any reason the Committee does not meet the requirements of Rule 16b-3 of the Exchange Act or Section 162(m) of the Code, such noncompliance shall not affect the validity of Awards, grants, interpretations or other actions of the Committee.

3.5    International Participants. With respect to Participants who are foreign nationals, reside or work outside the United States, or both, the Committee may, in its sole discretion, to comply with foreign law or practices and to further the purposes of the Plan, without amending the Plan, establish special rules, or adopt sub-plans or supplements, applicable to such Participants and grant Awards (or amend existing Awards) to such Participants in accordance with those rules or sub-plans.

**ARTICLE 4**
**SHARES SUBJECT TO THE PLAN**

4.1    Number of Shares. Subject to the following provisions of this Article 4 and the adjustment provisions of Section 13.1, the maximum number of Shares with respect to which Awards may be granted during the term of the Plan shall be 32,852,605.

4.2    Source of Shares. Shares will be made available from the currently authorized but unissued shares of the Company or from shares currently held or subsequently reacquired by the Company as treasury shares, including shares purchased in the open market or in private transactions.

4.3    Counting of Shares.

4.3.a.  Each Share underlying an Option, Stock Appreciation Right, Restricted Share, Restricted Stock Unit, Other Stock-Based Award or Cash-Based Award hereunder shall count as one Share; provided, however, that if a Stock Appreciation Right is granted in tandem with an Option, such grant shall count only once against the share maximum indicated in Section 4.1.

4.3.b.  Shares subject to an Award that is forfeited, expires or is settled for cash (in whole or in part), to the extent of such forfeiture, expiration or cash settlement shall be available for future grants of Awards under the Plan and shall be added back in the same number of Shares as were deducted in respect of the grant of such Award.  Additionally, Shares tendered by a Participant or withheld by the Company in payment of the exercise price of an Option or to satisfy any tax withholding obligation with respect to an Award shall be available for future grants of Awards under the Plan and shall be added back in the same number of Shares as were tendered or withheld.  The payment of dividend equivalent rights in cash in conjunction with any outstanding Awards shall not be counted against the Shares available for issuance under the Plan.

4.3.c.  To the extent that any option or other award outstanding pursuant to a Prior Plan, expires, is terminated, forfeited or canceled without having been exercised or settled in full, Shares subject to such awards shall be deemed to have not been delivered and shall be added to the share maximum; provided, however, that the aggregate number of Shares outstanding under the Prior Plans that may be

SC1:3811746.5

added to the share maximum pursuant to this Section 4.3.c shall not exceed 676,936 (as such number may be adjusted from time to time as provided in Section 13.1).

      4.3.d.  Shares issued in connection with awards that are assumed, converted or substituted as a result of the Company's acquisition of another company (including by way of merger, combination or similar transaction) will not count against the number of Shares that may be issued under the Plan.  Available shares under a stockholder approved plan of an acquired company (as appropriately adjusted to reflect the transaction) may be used for Awards under the Plan and do not reduce the maximum number of shares available for grant under the Plan, subject to applicable stock exchange requirements.

## ARTICLE 5
## ELIGIBILITY AND PARTICIPATION

      5.1    <u>General</u>. Awards under the Plan may be granted to Employees and Directors.

      5.2    <u>Committee Discretion</u>. Awards may be granted by the Committee at any time and from time to time to new Participants, or to ten Participants, or to a greater or lesser number of Participants, and may include or exclude previous Participants, as the Committee shall determine. The Committee's determinations under the Plan (including, without limitation, determinations of which Employees and Directors, if any, are to receive Awards, the form, amount and timing of such Awards, the terms and provisions of such Awards and the agreements evidencing same) need not be uniform and may be made by it selectively among individuals who receive, or are eligible to receive, Awards under the Plan.

## ARTICLE 6
## GRANTS OF STOCK OPTIONS

      6.1    <u>Grant of Options</u>. Options may be granted to Participants in such number and at such times during the term of the Plan as the Committee may determine, subject to the limits on grants set forth in Sections 6.3.a and 6.5.

      6.2    <u>Exercise Price</u>. The Committee shall fix the Exercise Price of the Option on the Date of Grant, which may not be less than the Fair Market Value of a Share on the Date of Grant.

      6.3    <u>Special Provisions Applicable to Incentive Options</u>.

      6.3.a.  Options granted under the Plan that are intended to qualify as Incentive Options shall be specifically designated as such in the applicable Agreement, and may be granted only to Employees of the Company or any Subsidiary who are citizens or resident aliens of the United States.  The maximum number of Shares with respect to which Incentive Options may be granted during the term of the Plan shall be 8,333,333 (as such number may be adjusted from time to time as provided in Section 13.1).

      6.3.b.  To the extent the aggregate Fair Market Value (determined as of the time the Option is granted) of the Shares with respect to which any Incentive Options granted hereunder may be exercisable for the first time by the Participant in any calendar year (under the Plan or any other compensation plan of the

8

Company or any Subsidiary) exceeds $100,000, such Options shall not be considered Incentive Options.

6.3.c.  No Incentive Option may be granted to an individual who, at the time the Option is granted, owns directly, or indirectly within the meaning of Section 424(d) of the Code, stock possessing more than ten percent of the total combined voting power of all classes of stock of the Company or of any Subsidiary, unless such Option (i) has an Exercise Price of at least one hundred ten percent of the Fair Market Value of the Shares on the Date of Grant of such Option; and (ii) cannot be exercised more than five years after the Date of Grant of such Option.

6.3.d.  The Participant shall notify the Company in writing immediately after the Participant makes a Disqualifying Disposition of any Shares acquired pursuant to the exercise of an Incentive Option.

6.4  <u>Option Term</u>. The Committee shall specify the term during which any Option may be exercised, which may not exceed ten years following the Date of Grant.

6.5  <u>Individual Limitations</u>. No Participant may be granted, in any fiscal year of the Company, Options covering more than 2,000,000 Shares (as such number may be adjusted from time to time as provided in Section 13.1).

6.6  <u>Exercises of Options</u>. Any Option may be exercised in whole or in part at any time to the extent such Option has become vested and exercisable during the term of such Option; <u>provided</u>, however, that each partial exercise shall be for whole Shares only. Each Option, or any exercisable portion thereof, may only be exercised in accordance with such procedures for the exercise of Options as the Committee may establish from time to time.

6.7  <u>Payment for Shares</u>. Payment for Shares purchased under an Option granted hereunder shall be made in full upon exercise of the Option (except that, in the case of an exercise arrangement approved by the Committee and described in clause (v) below, payment may be made as soon as practicable after the exercise). The method or methods of payment of the purchase price for the Shares to be purchased upon exercise of an Option and of any amounts required by Section 14.3 shall be determined by the Committee and may consist of (i) cash, (ii) check, (iii) the tendering, by either actual delivery or by attestation, of whole Shares, having a Fair Market Value as of the day of exercise equal to the aggregate Exercise Price, (iv) the surrendering of all or part of the Shares issuable upon exercise of the Option by the largest whole number of Shares with a Fair Market Value that does not exceed the aggregate Exercise Price; <u>provided</u>, however, that the Company shall accept a cash or other payment to the extent of any remaining balance of the aggregate Exercise Price not satisfied by such reduction in the number of whole shares to be issued, or (v) through a special sale and remittance procedure pursuant to which the Participant shall concurrently provide irrevocable written instructions to (a) a Company-designated brokerage firm to effect the immediate sale of the purchased Shares and remit to the Company, out of the sale proceeds available on the settlement date, sufficient funds to cover the aggregate Exercise Price payable for the purchased Shares plus all applicable Federal, state and local employment taxes required to be withheld by the Company by reason of such exercise, and (b) the Company to deliver the certificates for the purchased Shares directly to such brokerage firm in order to complete the sale. The permitted method or methods of payment of the amounts payable upon exercise of an Option, if other than in cash, shall be set forth in the applicable Agreement and may be subject to such conditions as the Committee deems appropriate. If

the Option Exercise Price may be paid in Shares as provided above, Shares delivered by the Participant may be Shares which were received by the Participant upon exercise of one or more previously exercised Options, but only if such Shares have been held by the Participant for at least six months, or such other period of time (if any) as is required, in the opinion of the Company's auditor, to avoid adverse financial accounting results.

**ARTICLE 7**
**GRANTS OF STOCK APPRECIATION RIGHTS**

7.1     <u>Grant of Stock Appreciation Rights</u>. Stock Appreciation Rights may be granted to Participants in such number and at such times during the term of the Plan as the Committee may determine, subject to the limits on grants set forth in Section 7.4.  The Committee may grant Stock Appreciation Rights either independently or in connection with an Option.

7.2     <u>Exercise Price</u>. The Committee shall fix the Exercise Price of the Stock Appreciation Right on the Date of Grant, which shall not be less than the Fair Market Value of a Share on the Date of Grant.

7.3     <u>Stock Appreciation Right Term</u>. The Committee shall specify the term during which any Stock Appreciation Right may be exercised, which may not exceed ten years following the Date of Grant.

7.4     <u>Individual Limitations</u>. No Participant may be granted, in any fiscal year of the Company, Stock Appreciation Rights covering more than 2,000,000 Shares (as such number may be adjusted from time to time as provided in Section 13.1).

7.5     <u>Exercises of Stock Appreciation Rights</u>.  Any Stock Appreciation Right may be exercised in whole or in part at any time to the extent such Option has become vested and exercisable during the term of such Stock Appreciation Right; <u>provided</u>, however, that each partial exercise shall be for whole Shares only. Each Stock Appreciation Right, or any exercisable portion thereof, may only be exercised in accordance with such procedures for the exercise of Stock Appreciation Rights as the Committee may establish from time to time.

7.6     <u>Payment Upon Exercise of Stock Appreciation Rights</u>. A Stock Appreciation Right granted in connection with an Option shall entitle the holder to receive from the Company in exchange for the surrender to the Company of the related unexercised Option, or any portion thereof, an amount equal to the excess of the Fair Market Value of one Share on the day of the surrender of such Option over the Option Exercise Price.  A Stock Appreciation Right granted independently of an Option shall entitle the holder to receive upon exercise an amount equal to the excess of the Fair Market Value of one Share on the day the Stock Appreciation Right is exercised over the Exercise Price of such Stock Appreciation Right.  The Company's obligation to any Participant exercising a Stock Appreciation Right may be paid in cash or Shares, or partly in cash and partly in Shares, at the sole discretion of the Committee. The number of Shares deliverable upon the satisfaction of an obligation in respect of a Stock Appreciation Right that is satisfied in Shares shall be determined based on the Fair Market Value of a Share on the date of exercise of such Stock Appreciation Right.

**ARTICLE 8**
**GRANTS OF RESTRICTED SHARES**

8.1     Form of Awards. Restricted Shares may be granted to Participants in such number and at such times during the term of the Plan as the Committee may determine. Restricted Shares shall be evidenced in such manner as the Committee may determine, including through a book entry system with the transfer agent. Any certificates issued in respect of Restricted Shares shall be registered in the name of the Participant and, unless otherwise determined by the Committee, deposited by the Participant, together with a stock power endorsed in blank, with the Company (or its designee). Upon becoming vested, the Company (or such designee) shall deliver such certificates to the Participant or, if the Participant has died, in accordance with the Participant's will or the laws of descent of distribution. Each certificate evidencing Restricted Shares shall bear an appropriate legend referring to the terms, conditions and restrictions applicable to such Restricted Shares.

8.2     Right to Vote; Dividends.

8.2.a.  During the restriction period, the Participant shall have all the rights of a stockholder for each Restricted Share, including the right to vote and the right to receive dividends thereon as paid and, subject to and conditioned upon the full vesting of such Restricted Share, the right to tender such Restricted Share.

8.2.b.  Dividend payments in the case of a Restricted Share that is subject to performance vesting conditions shall be treated as unvested so long as such Restricted Share remains unvested, and any such dividend payments that would otherwise have been paid during the applicable vesting period shall instead be accumulated (and, if paid in cash, reinvested in additional Shares based on the Fair Market Value of the Shares on the date of reinvestment) and paid within 30 days following the date on which such Restricted Share is determined by the Committee to have satisfied such performance vesting conditions. Any dividend payments that are accumulated and paid after the date specified in the preceding sentence may be treated separately from the right to other amounts under the Award.

**ARTICLE 9**
**GRANTS OF RESTRICTED STOCK UNITS**

9.1     Form of Awards.  Restricted Stock Units may be granted to Participants in such number and at such times during the term of the Plan and subject to such terms and conditions as the Committee may determine, including, without limitation, the achievement of performance goals.  A Participant granted Restricted Stock Units will have only the rights of a general unsecured creditor of the Company until delivery of the Shares, cash or other securities or property is made as specified in the applicable Agreement.  On the delivery date specified in the Agreement, the Participant will receive one Share, or cash, securities or other property equal in value to a Share, or a combination thereof, as specified by the Committee.

9.2     Dividend Equivalents.

9.2.a.  Restricted Stock Units may provide the Participant with the right to receive dividend equivalent payments with respect to Shares subject to the Award (both before and after the Share subject to the Award is earned, vested or acquired),

SC1:3811746.5

which payments may be either made currently or credited to an account for the Participant, and may be settled in cash or Shares, as determined by the Committee. A Participant granted a dividend equivalent right will have only the rights of a general unsecured creditor of the Company until the payment of such amounts is made as specified in the applicable Agreement.

9.2.b.   Unless the Committee otherwise specifies in the Agreement and subject to Section 9.3.c, dividend equivalent payments shall be paid to the Participant at least annually, not later than the fifteenth day of the third month following the end of the calendar year in which the dividend equivalent payments are credited (or, if later, the fifteenth day of the third month following the end of the calendar year in which the dividend equivalent payments are no longer subject to a "substantial risk of forfeiture" within the meaning of Section 409A of the Code).

9.2.c.   Dividend equivalent payments in the case of Restricted Stock Units that are subject to performance vesting conditions shall be treated as unvested so long as such Restricted Stock Units remain unvested, and any such dividend equivalent payments that would otherwise have been paid during the applicable vesting period shall instead be accumulated (and, if paid in cash, reinvested in additional Shares based on the Fair Market Value of the Shares on the date of reinvestment) and paid within 30 days following the date on which such Restricted Stock Units are determined by the Committee to have satisfied such performance vesting conditions. Any dividend equivalent payments that are accumulated and paid after the date specified in the preceding sentence may be treated separately from the right to other amounts under the Award.

## ARTICLE 10
## OTHER STOCK-BASED AWARDS

The Committee may grant other types of equity-based or equity-related Awards (including, without limitation, the grant or offer for sale of unrestricted Shares) in such amounts and subject to such terms and conditions as the Committee may determine. Such Awards may entail the transfer of actual Shares to Participants or may be settled in cash, other securities, other Awards or other property (or a combination thereof) and may include Awards designed to comply with or take advantage of the applicable local laws of jurisdictions other than the United States.

## ARTICLE 11
## GRANTS OF CASH-BASED AWARDS

The Committee may grant cash-based Awards in such amounts and subject to such terms and conditions as the Committee may determine, subject to Section 12.3, if applicable.

## ARTICLE 12
## PERFORMANCE-BASED AWARDS

12.1   Performance-Based Awards. The Committee may provide that the vesting of an Award will be determined based on the achievement of one or more performance criteria (the "Performance Factor(s)").  The Performance Factors applicable to any Award granted to a Covered Employee shall be specified coincident with the grant of the Award,

12

and in no event later than ninety days after the commencement of any fiscal year in respect of which the relative achievement of the Performance Factor is to be measured or such other date as is required by Section 162(m) of the Code.

   12.2   <u>Performance Factors</u>.  Performance Factors may include any or all of the following: enterprise value or value creation targets; after-tax or pre-tax profits (including net operating profit after taxes) or net income, including without limitation that attributable to continuing and/or other operations; after-tax or pre-tax margins; revenues; operational cash flow or earnings before income tax or other exclusions (including free cash flow, cash flow per share or earnings before interest, taxes, depreciation and amortization); reduction of, or limiting the level of increase in, all or a portion of the Company's bank debt or other long-term or short-term public or private debt or other similar financial obligations of the Company, which may be calculated net of cash balances and/or other offsets and adjustments as may be established by the Committee; consummation of debt and equity offerings; equity capital raised; earnings per share, earnings per diluted share or earnings per share from continuing operations; return on capital employed (including, without limitation, return on invested capital or return on committed capital), return on revenues, return on assets and return on stockholders' equity; market share; the fair market value of the shares of the Company's common stock, par value $0.01 per share; the growth in the value of an investment in the Shares assuming the reinvestment of dividends; reduction of, or limiting the level of increase in, all or a portion of controllable expenses or costs or other expenses or costs (including selling, general and administrative expenses or costs (excluding advertising) as a percentage of sales); economic value added targets based on a cash flow return on investment formula; customer satisfaction or service measures or indices; employee satisfaction; efficiency or productivity measures; asset management (*e.g.*, inventory and receivable levels); compliance goals (*e.g.*, regulatory and legal compliance); or strategic business objectives, goals or initiatives.

In addition, Performance Factors may be based upon the attainment of specified levels of Company (or subsidiary, division, other operational unit or administrative department of the Company) performance under one or more of the measures described above relative to the performance of other corporations or the historic performance of the Company and may be combined with cost of capital, assets, invested capital and stockholder equity to form an appropriate measure of performance. With respect to an Award subject to Section 162(m) of the Code and to the extent permitted thereunder (including, without limitation, compliance with any requirements for stockholder approval), the Committee may: (i) designate additional business criteria on which the Performance Factors may be based or (ii) adjust, modify or amend the aforementioned business criteria. The Performance Factors may incorporate, if and only to the extent permitted under Section 162(m) of the Code if Section 162(m) is applicable to such Award, provisions for disregarding (or adjusting for) changes in accounting methods, corporate transactions (including, without limitation, dispositions and acquisitions) and other similar type events or circumstances. To the extent an Award is subject to Section 162(m) of the Code and any such provision would create impermissible discretion under Section 162(m) of the Code or otherwise violate Section 162(m) of the Code, such provision shall be of no force or effect.

   12.3   <u>Individual Limitations</u>.  Notwithstanding anything to the contrary contained in the Plan, the maximum number of Shares with respect to which Awards may be granted to a Covered Employee for any 12-month period contained in the performance period for such Award shall be 2,000,000 (as adjusted pursuant to the provisions of Section 13.1 of the Plan) and the maximum payment under any Award granted to a Covered Employee

13

(valued as of the date of grant of such Award(s)) shall be $15 million for each 12-month period contained in the performance period for such Award. The grant limits under the preceding sentence shall apply to an Award only if the Award is intended to be "performance-based compensation" as that term is used in Section 162(m) of the Code. The Committee may structure the terms of a Performance Factor so as to permit the reduction or elimination of any Award under the Plan, but in no event may the Committee exercise discretion to increase the amount or vesting of an Award that is intended to comply with Section 162(m) of the Code.

## ARTICLE 13
## EVENTS AFFECTING PLAN RESERVE OR AWARDS

13.1   <u>Capital Adjustments</u>.

13.1.a.   If the Company subdivides its outstanding Shares into a greater number of Shares (including, without limitation, by stock dividend or stock split) or combines its outstanding Shares into a smaller number of shares (by reverse stock split, reclassification or otherwise), or the Committee determines that any stock dividend, extraordinary cash dividend, reclassification, recapitalization, reorganization, split-up, spin-off, combination, exchange of shares, warrants or rights offering to purchase Shares, or other similar corporate event (including mergers or consolidations) affects the Shares such that an adjustment is required in order to preserve the benefits or potential benefits intended to be made available under the Plan, then the Committee shall, in such manner as it may deem equitable and appropriate, make such adjustments to any or all of (i) the aggregate number and/or kind of Shares reserved for the Plan, (ii) the number and/or kind of shares subject to outstanding Awards, (iii) the Exercise Price with respect to outstanding Options and Stock Appreciation Rights, (iv) the individual Participant share limitations set forth in Sections 6.5, 7.4 and 12.3 (but not the dollar limitation set forth in Section 12.3), (v) the number of Shares set forth in Section 6.3.a that can be issued through Incentive Options and (vi) any other adjustment that the Committee determines to be equitable; <u>provided</u>, however, that the number of Shares subject to any Option shall be rounded down to the nearest whole number; <u>provided</u>, further, that no such adjustment shall be made if or to the extent that it would cause an outstanding Award to cease to be exempt from, or to fail to comply with, Section 409A of the Code. The Committee may provide for a cash payment to any Participant of a Plan Award in connection with any adjustment made pursuant to this Section 13.1. Any such adjustment shall be final and binding upon all Participants, the Company, their representatives and all other interested persons.

13.1.b.   In the event of a transaction involving (i) a merger or consolidation in which the Company is not the surviving company or (ii) the sale or disposition of all or substantially all of the Company's assets, provision shall be made in connection with such transaction for the assumption of Awards theretofore granted under the Plan, or the substitution for such Awards of new Awards of the successor corporation, with appropriate adjustment as to the number and/or kind of shares and the purchase price for shares thereunder, or, in the discretion of the Committee, the Plan and the Awards issued hereunder shall terminate on the effective date of such transaction if appropriate provision is made for payment to the Participant of an amount in cash equal to the Fair Market Value of a Share multiplied by the number of Shares subject to the Award less, in the case of Options and Stock Appreciation Rights, the Exercise Price for such Awards; <u>provided</u>, however, for the avoidance of

doubt, if a transaction described above occurs, the Committee may, in its sole discretion, terminate any Option or Stock Appreciation Right for which the Exercise Price is equal to or exceeds the Fair Market Value of a Share without payment of consideration therefor.

13.2   <u>Change-In-Control</u>.

13.2.a.   Unless the Committee determines otherwise or as otherwise provided in an Agreement:  (i) in the event of a Change-In-Control, the performance conditions of each outstanding performance-based Award shall be deemed earned at the target level (or, if no target level is specified, the maximum level) as of the effective date of the Change-In-Control with respect to all open performance periods; <u>provided</u> that such Award or Share shall remain subject to any service-based vesting conditions, and (ii) in the event of a Termination of Service by the Company without Cause or by a Participant for Good Reason within 12 months following a Change-In-Control, each outstanding Award subject to a service-based vesting condition shall become fully vested and, in the case of Options and Stock Appreciation Rights, fully exercisable.

13.2.b.   In the event of a Change-In-Control, outstanding Awards will be treated, to the extent determined by the Committee in its sole discretion and subject to Section 409A of the Code, in accordance with one or more of the following:  (i) settle Awards for an amount (as determined in the sole discretion of the Committee) of cash or securities, where in the case of Options and Stock Appreciation Rights, the value of such amount, if any, will be equal to the in-the-money spread value (if any) of such Awards; (ii) provide for the assumption of or the issuance of substitute awards that will substantially preserve the otherwise applicable terms of outstanding Awards, as determined by the Committee in its sole discretion; (iii) modify the terms of Awards to add events, conditions or circumstances upon which the vesting of such Awards or lapse of restrictions thereon will accelerate or (iv) provide that for a period of at least 20 days prior to the Change-In-Control, any Options or Stock Appreciation Rights that would not otherwise become exercisable prior to the Change-In-Control will be exercisable as to all Shares subject thereto (but any such exercise will be contingent upon and subject to the occurrence of the Change-In-Control and if the Change-In-Control does not take place within a specified period after giving such notice for any reason whatsoever, the exercise will be null and void) and that any Options or Stock Appreciation Rights not exercised prior to the consummation of the Change-In-Control will terminate and be of no further force and effect as of the consummation of the Change-in-Control.  For the avoidance of doubt, in the event of a Change-In-Control where all Options and Stock Appreciation Rights are settled for an amount (as determined in the sole discretion of the Committee) of cash or securities, the Committee may, in its sole discretion, terminate any Option or Stock Appreciation Right for which the Exercise Price is equal to or exceeds the per share value of the consideration to be paid in the Change-In-Control transaction without payment of consideration therefor.

13.2.c.   Notwithstanding any other provision of the Plan to the contrary, if a Change-In-Control occurs that is not a change in the ownership or effective control of the Company, or in the ownership of a substantial portion of the assets of the Company, within the meaning of Section 409A of the Code, and payment or distribution of an Award that is "nonqualified deferred compensation" subject to Section 409A of the Code would otherwise be made or commence on the date of such Change-In-Control (pursuant to the Plan, the Award or otherwise), (i) the vesting of

SC1:3811746.5

such Award shall accelerate in accordance with the Plan and the Award, (ii) such payment or distribution shall not be made or commence prior to the earliest date on which Section 409A of the Code permits such payment or distribution to be made or commence without additional taxes or penalties under Section 409A of the Code, and (iii) in the event any such payment or distribution is deferred in accordance with the immediately preceding clause (ii), such payment or distribution that would have been made prior to the deferred payment or commencement date, but for Section 409A of the Code, shall be paid or distributed on such earliest payment or commencement date, together, if determined by the Committee, with interest at the rate established by the Committee.

13.3   <u>Divestitures</u>.  In the event of the Company's sale or divestiture of a business unit or Subsidiary that is not a Change-In-Control, the Committee may take such action, or no action, with respect to outstanding Awards as it determines in its sole discretion. For the avoidance of doubt and notwithstanding anything in the Plan or an Agreement to the contrary, a Termination of Service by reason of the Company's sale or divestiture of a business unit where such transaction is not a Change-In-Control shall not constitute a Termination of Service by the Company without Cause.

13.4   <u>Recapture; Adjustment of Awards</u>. If at any time within two years after the date on which a Participant exercises an Option or Stock Appreciation Right, or on which Restricted Stock vests, or which is the maturity date of Restricted Stock Units, Cash-Based Awards or Other Stock-Based Awards  (each of which is a "realization event"), the Participant (a) is terminated for Cause, (b) engages in or has engaged in any activity that is a violation of a non-compete agreement, (c) violates or has violated any confidentiality or proprietary information obligation Participant owes to the Company (including, but not limited to, the confidentiality or proprietary information obligations in any non-compete agreement, employment agreement, offer letter, employee handbook, non-disclosure agreement, Code of Business Conduct or Ethics, equity award agreement, or any other Company agreement signed by the Participant that contains such obligations), and/or (d) engages in or has engaged in any act of fraud against the Company, then any gain realized by the Participant from the realization event shall be paid by the Participant to the Company upon notice from the Company. Such gain shall be determined on a gross basis, without reduction for any taxes incurred, as of the date of the realization event, without regard to any subsequent change in the Fair Market Value of a Share. The Company shall have the right to offset such gain against any amounts otherwise owed to the Participant by the Company (whether as wages, vacation pay, or pursuant to any benefit plan or other compensatory arrangement).

In addition, the Company reserves the right to cancel or adjust the amount of any Award if the financial statements of the Company on which the calculation or determination of the Award was based are subsequently restated due to error or misconduct and, in the judgment of the Committee, the financial statements as so restated would have resulted in a smaller or no Award if such information had been known at the time the Award had originally been calculated or determined.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

14.1   <u>Legends</u>. Each certificate evidencing Shares obtained through the Plan shall bear such legends as the Committee deems necessary or appropriate to reflect or refer to any terms, conditions or restrictions applicable to such Shares, including, without

16

limitation, any to the effect that the Shares represented thereby (i) are subject to contractual restrictions regarding disposition, and (ii) may not be disposed of unless the Company has received an opinion of counsel, acceptable to the Company, that such dispositions will not violate any federal or state securities laws.

All certificates for Shares delivered under the Plan and/or all Shares delivered under the Plan held in book entry accounts shall be subject to such stop transfer orders and other restrictions as the Committee may, in its sole discretion, deem advisable under the rules, regulations and other requirements of the Securities and Exchange Commission, any stock exchange upon which the Shares may then be listed, any applicable federal or state securities law, and any applicable corporate law, and the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions.

14.2   <u>Compliance with Other Laws and Regulations</u>. The obligation of the Company with respect to the grant, exercise and settlement of Awards hereunder shall be subject to all applicable laws, rules and regulations and such approvals by any governmental agencies as may be required, including, without limitation, the effectiveness of any registration statement required under the Securities Act, and the rules and regulations of any securities exchange or association on which the Shares may be listed or quoted.

14.3   <u>Payroll Tax Withholding</u>. The Company's obligation to deliver Shares under the Plan shall be subject to applicable federal, state and local tax withholding requirements. To the extent that the Company is required to withhold any Federal, state or local taxes in respect of any compensation income realized by the Participant in respect of an Award or Shares acquired pursuant to an Award, or in respect of any such Award or Shares becoming vested or upon making an election under Section 83(b) of the Code, then the Company shall deduct from any payments of any kind otherwise due to such Participant the aggregate amount of such Federal, state or local taxes required to be so withheld. If no such payments are due or to become due to such Participant, or if such payments are insufficient to satisfy such Federal, state or local taxes, then such Participant will be required to pay to the Company, or make other arrangements satisfactory to the Company regarding payment to the Company of, the aggregate amount of any such taxes. All matters with respect to the total amount of taxes to be withheld in respect of any such compensation income shall be determined by the Committee, in its sole discretion. Federal, state and local withholding tax due upon the exercise of any Option or Stock Appreciation Right, the vesting of an Award or upon making an election under Section 83(b) of the Code may, in the discretion of the Committee, be paid in Shares already owned by the Participant or through the withholding of Shares otherwise issuable to such Participant, upon such terms and conditions as the Committee shall determine which Shares shall have an aggregate Fair Market Value equal to the required minimum withholding payment.

14.4   <u>Nonassignability; No Hedging</u>. Unless otherwise provided in an Agreement, no Award (or any rights and obligations thereunder) granted to any Participant under the Plan may be sold, exchanged, transferred, assigned, pledged, hypothecated or otherwise disposed of or hedged, in any manner (including through the use of any cash-settled instrument), whether voluntarily or involuntarily and whether by operation of law or otherwise, other than by will or by the laws of descent and distribution, and all such Awards (and any rights thereunder) will be exercisable during the life of the Participant only by the Participant or the Participant's legal representative.  Notwithstanding the

foregoing, the Committee may permit, under such terms and conditions that it deems appropriate in its sole discretion, a Participant to transfer any Award to any person or entity that the Committee so determines. Any sale, exchange, transfer, assignment, pledge, hypothecation, or other disposition in violation of the provisions of this Section 14.4 will be null and void and any Award which is hedged in any manner will immediately be forfeited. All of the terms and conditions of the Plan and the Agreements will be binding upon any permitted successors and assigns.

      14.5   <u>Exclusion from Benefit Computation</u>. By acceptance of an Award, unless otherwise provided in the applicable Agreement, each Participant shall be deemed to have agreed that such Award is special incentive compensation that will not be taken into account, in any manner, as salary, compensation or bonus in determining the amount of any payment under any health and welfare, pension, retirement or other employee benefit plan, program or policy of the Company.

      14.6   <u>Governing Law</u>. The Plan shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to principles of conflict of laws.

      14.7   <u>No Rights to Continued Employment</u>. The Plan does not constitute a contract of employment, and selection as a Participant will not give any participating Employee or other Eligible Individual the right to be retained in the employ of the Company, or the right to continue to provide services to the Company, nor any right or claim to any benefit under the Plan, unless such right or claim has specifically accrued under the terms of the Plan.

      14.8   <u>Waiver of Claims</u>. Each Participant recognizes and agrees that before being selected by the Committee to receive an Award he or she has no right to any benefits hereunder. Accordingly, in consideration of the Participant's receipt of any Award hereunder, he or she expressly waives any right to contest the amount of any Award, the terms of any Agreement, any determination, action or omission hereunder or under any Agreement by the Committee, the Company or the Board, or any amendment to the Plan or any Agreement (other than an amendment to the Plan or an Agreement to which his or her consent is expressly required by the express terms of an Agreement).

      14.9   <u>No Liability with Respect to Tax Qualification or Adverse Tax Treatment</u>. Notwithstanding anything to the contrary contained herein, in no event shall the Company be liable to a Participant on account of an Award's failure to (a) qualify for favorable United States or foreign tax treatment or (b) avoid adverse tax treatment under United States or foreign law, including, without limitation, Section 409A.

      14.10   <u>Gender and Number</u>. Where the context permits, words in any gender shall include the other gender, words in the singular shall include the plural, and the plural shall include the singular.

      14.11   <u>Unfunded Status</u>. Neither a Participant nor any other person shall, by reason or participation in the Plan, acquire any right in or title to any assets, funds or property of the Company whatsoever, including, without limitation, any specific funds, assets, or other property which the Company, in its sole discretion may set aside in anticipation of a liability under the Plan. A Participant shall have only a contractual right to the Shares or amounts, if any, payable under the Plan, unsecured by any assets of the Company, and nothing contained in the Plan shall constitute a guarantee that the assets of the Company shall be sufficient to pay any benefits to any person.

18

14.12  Section 409A. It is the intention of the Company that each Award be exempt from or comply with the terms of Section 409A of the Code, unless and to the extent that the Committee specifically determines otherwise as provided below, and the Plan and the terms and conditions of each Award shall be interpreted, construed and administered in accordance with this intent, so as to avoid the imposition of taxes and penalties on Participants pursuant to Section 409A. The Company shall have no liability to any Participant or otherwise if the Plan or the vesting, exercise or payment of any Award hereunder are subject to the additional tax and penalties under Section 409A of the Code. Notwithstanding any other provision of the Plan to the contrary, with respect to any Award that is subject to Section 409A of the Code, if a Participant is a "specified employee" (as such term is defined in Section 409A of the Code and as determined by the Company) as of the Participant's Termination of Service, any payments (whether in cash, Shares or other property) to be made with respect to the Award upon the Participant's Termination of Service will be accumulated and paid (without interest) on the earlier of (i) the first business day of the seventh month following the Participant's "separation from service" (as such term is defined and used in Section 409A of the Code) or (ii) the date of the Participant's death.  If an Award that is subject to Section 409A of the Code (a) includes a "series of installment payments" (within the meaning of Section 1.409A-2(b)(2)(iii) of the regulations promulgated under the Code), the Participant's right to the series of installment payments shall be treated as a right to a series of separate payments and not as a right to a single payment and (b) includes "dividend equivalents" (within the meaning of Section 1.409A-3(e) of the regulations promulgated under the Code), the Participant's right to the dividend equivalents shall be treated separately from the right to other amounts under the Award.

14.13  Choice of Forum.

14.13.a.  Jurisdiction. The Company and each Participant, as a condition to such Participant's participation in the Plan, hereby irrevocably submit to the exclusive jurisdiction of any state or federal court of appropriate jurisdiction located in Newark, New Jersey over any suit, action or proceeding arising out of or relating to or concerning the Plan that is not otherwise arbitrated or resolved according to Section 14.14. The Company and each Participant, as a condition to such Participant's participation in the Plan, acknowledge that the forum designated by this Section 14.13.a has a reasonable relation to the Plan and to the relationship between such Participant and the Company. Notwithstanding the foregoing, nothing herein shall preclude the Company from bringing any action or proceeding in any other court for the purpose of enforcing the provisions of this Section 14.13.

14.13.b.  Acceptance of Jurisdiction. The agreement by the Company and each Participant as to forum is independent of the law that may be applied in the action, and the Company and each Participant, as a condition to such Participant's participation in the Plan, (i) agree to such forum even if the forum may under applicable law choose to apply non-forum law, (ii) hereby waive, to the fullest extent permitted by applicable law, any objection which the Company or such Participant now or hereafter may have to personal jurisdiction or to the laying of venue of any such suit, action or proceeding in any court referred to in Section 14.13.a, (iii) undertake not to commence any suit, action or proceeding arising out of or relating to or concerning the Plan in any forum other than the forum described in this Section 14.13 and (iv) agree that, to the fullest extent permitted by applicable law, a final and non-appealable judgment in any such suit, action or proceeding in any such court shall be conclusive and binding upon the Company and each Participant.

SC1:3811746.5

14.13.c. <u>Service of Process</u>. Each Participant, as a condition to such Participant's participation in the Plan, hereby irrevocably appoints the General Counsel of KCG as such Participant's agent for service of process in connection with any action, suit or proceeding arising out of or relating to or concerning the Plan that is not otherwise arbitrated or resolved according to Section 14.13, who shall promptly advise such Participant of any such service of process.

14.13.d. <u>Confidentiality</u>. Each Participant, as a condition to such Participant's participation in the Plan, agrees to keep confidential the existence of, and any information concerning, a dispute, controversy or claim described in this Section 14.13, except that a Participant may disclose information concerning such dispute, controversy or claim to the arbitrator or court that is considering such dispute, controversy or claim or to such Participant's legal counsel (<u>provided</u> that such counsel agrees not to disclose any such information other than as necessary to the prosecution or defense of the dispute, controversy or claim).

14.14   <u>Dispute Resolution</u>. Subject to the provisions of Section 14.13, any dispute, controversy or claim between the Company and a Participant, arising out of or relating to or concerning the Plan or any Award shall be finally settled by binding arbitration in Newark, New Jersey before, and in accordance with the rules then obtaining of, the New York Stock Exchange, Inc. ("<u>NYSE</u>") or, if NYSE declines to arbitrate the matter (or if the matter otherwise is not arbitrable by it), the American Arbitration Association (the "<u>AAA</u>") in accordance with the commercial arbitration rules of the AAA. Prior to arbitration, all claims maintained by a Participant must first be submitted to the Committee in accordance with claims procedures determined by the Committee.

**ARTICLE 15**
**TERMINATION AND AMENDMENT**

15.1   <u>Termination and Amendment of the Plan</u>. The Board or the Committee may at any time terminate, suspend or discontinue the Plan or modify or amend the Plan in such respects as it shall deem advisable; <u>provided</u>, however, that no amendment shall be made without stockholder approval if such amendment (i) would increase the maximum aggregate number of Shares that may be issued under the Plan (other than pursuant to Section 13.1), (ii) would materially modify the requirements for participation in the Plan, (iii) would materially increase the benefits accruing to Participants under the Plan or (iv) requires stockholder approval to comply with any applicable laws, regulations or rules, including the rules of a securities exchange or self-regulatory agency.

15.2   <u>Modification</u>. No termination, modification or amendment of the Plan or any outstanding Award may, without the consent of the person to whom any Award shall theretofore have been granted, materially and adversely affect the rights of such person with respect to such outstanding Award.  No Option or Stock Appreciation Right may be repriced, replaced, regranted through cancellation, exchanged for cash or modified without stockholder approval (except in connection with an event described in Section 13.1), if the effect of such change in terms would be to reduce the Exercise Price for the Shares underlying such Option or Stock Appreciation Right.

SC1:3811746.5

2014 Year-End Version (US)

KCG HOLDINGS, INC.
AMENDED AND RESTATED EQUITY INCENTIVE PLAN
RESTRICTED STOCK UNIT AGREEMENT

Name of Grantee:                              ROHIT KHANDEKAR

Restricted Stock Units:                       4,085 Restricted Stock Units ("Stock Units")

Grant Date:                                   02/04/2015

Grant Number:                                 A0008177

Dates Upon Which                             1. 1,362 Stock Units, on 02/04/2016
Restrictions Lapse:                          2. 1,362 Stock Units, on 02/04/2017
(subject to accelerated                      3. 1,361 Stock Units, on 02/04/2018
lapse of restrictions as
set forth in Section 3
of this Agreement)


                    *        *        *        *        *        *        *        *


     This Restricted Stock Unit Agreement (the "Agreement") is entered into as of the Grant Date by and between KCG Holdings, Inc. and any successor entity (collectively, the "Company") and the Grantee. The Grantee and the Company hereby agree as follows:

1.    The Company, pursuant to the Company's Amended and Restated Equity Incentive Plan (the "Plan"), which is incorporated herein by reference, and subject to the terms and conditions thereof, hereby grants to the Grantee the above mentioned Stock Units. Any capitalized term, to the extent not defined herein, shall have the same meaning as set forth in the Plan.

2.    For purposes of this Agreement, the "Restricted Period" means the period from the Grant Date until the date on which the vesting restrictions applicable to Stock Units lapse. Except as set forth in Section 3 of this Agreement, all restrictions imposed on the Stock Units shall lapse upon the expiration of the Restricted Period applicable to such Stock Units, and upon the expiration of the Restricted Period applicable to each such Stock Unit, the Company shall deliver to the Grantee, for each Stock Unit, a share of Common Stock, $.01 par value, of KCG Holdings, Inc. ("Shares").

3.    Except as otherwise provided for in a Grantee's Offer Letter or Employment Agreement with the Company or an Affiliate, if applicable: (a) if the Grantee's employment with, or provision of services to, the Company or any of its Affiliates shall terminate for any reason other than such Grantee's death, Disability, Retirement or termination by the Company or any of its Affiliates without Cause during the Restricted Period, all Stock Units held by the Grantee still subject to restrictions shall be forfeited upon such termination and (b) in the event of the Grantee's death, Disability, Retirement or termination by the Company or any of its Affiliates without Cause, the restrictions applicable to the Stock Units shall lapse (subject to the forfeiture provisions of the Plan), and the Stock Units shall be deemed fully vested in accordance with the terms of the Plan.

4.    The Stock Units shall be appropriately adjusted to reflect any stock dividend, stock split, combination or exchange of shares or other change in capitalization with a similar substantive effect upon the Plan, the Shares or the Stock Units. The Committee shall have the power and sole discretion to determine the nature and amount of the adjustment to be made, if any. Any adjustment so made shall be final and binding.

5.    The Grantee shall have no rights as a stockholder of the Company, no dividend rights (except as expressly provided below) and no voting rights, with respect to the Stock Units and any Shares underlying or issuable in respect of such Stock Units until such Shares are actually issued to and held of record by the Grantee. Notwithstanding the above, on

the date Shares are actually issued to the Grantee in respect of a Stock Unit, the Company shall pay the Grantee an amount in cash equal to the aggregate amount of the ordinary cash dividends (if any) paid by the Company on a Share for which the related dividend payment record date(s) occurred on or after the Grant Date and on or before the date such Stock Unit became vested pursuant to the terms hereof (the right to receive such payment is referred to herein as a "Dividend Equivalent Right"). For purposes of clarity, no interest shall accrue with respect to the period between the dividend payment record date and the date of payment of any Dividend Equivalent Rights, and no Dividend Equivalent Rights shall be paid with respect to any Stock Units that terminate pursuant to Section 3.

6.       The Company shall withhold all applicable taxes required by law from all amounts paid in respect of the Stock Units upon the vesting of, or lapse of restrictions on, or payment of, any or all of the Stock Units. The Grantee may satisfy the withholding obligation by paying the amount of any taxes in cash or, with the approval of the Committee, shares of stock may be deducted from the payment to satisfy the obligation in full or in part. The amount of the withholding and the number of shares to be deducted shall be determined by the Committee with reference to the Fair Market Value of the stock when the withholding is required to be made.

7.       The Grantee specifically acknowledges that the Stock Units and any Shares or cash delivered in settlement thereof are subject to the provisions of Section 11.5 of the Plan, entitled "Recapture; Adjustment of Awards," and the Company's Compensation Recoupment Policy, if applicable to the Grantee, which can cause the forfeiture of any gain realized upon the vesting of the Stock Units and/or the cancellation or adjustment of any grant of Stock Units.

8.       If the Grantee attempts to have any dispute that arises out of or relates to this Agreement resolved in any manner that is not provided for by Sections 12.12 (entitled "Choice of Forum") or 12.13 (entitled "Dispute Resolution") of the Plan, then (i) all outstanding Stock Units awarded to the Grantee under this Agreement shall be forfeited, and (ii) any gain realized by the Grantee from the delivery of any Shares or cash in settlement of the Stock Units awarded under this Agreement shall be paid by the Grantee to the Company upon notice from the Company.

9.       Except with the consent of the Committee, no Stock Units shall be assignable or transferable except by will or by the laws of descent and distribution while such Stock Units remain subject to restrictions.

10.      Nothing herein shall obligate the Company or any Subsidiary or Affiliate of the Company to continue the Grantee's service for any particular period or on any particular basis of compensation.

11.      The obligation of the Company to deliver Shares or cash in respect of Stock Units granted under this Agreement is specifically subject to all provisions of the Plan and all applicable laws, rules, regulations and governmental and stockholder approvals.

12.      Any notice by the Grantee to the Company hereunder shall be in writing and shall be deemed duly given only upon receipt thereof by the Company at its principal offices. Any notice by the Company to the Grantee shall be in writing and shall be deemed duly given if mailed to the Grantee at the address last specified to the Company by the Grantee.

13.      The grant of Stock Units herein is not enforceable until this Agreement has been signed by the Company and acknowledged by the Grantee. By acknowledging this Agreement, the Grantee shall be deemed to have accepted and consented to any action taken under the Plan by the Committee, the Board or its delegates, and shall be deemed to have agreed that these Stock Units are special incentive compensation that will not be taken into account, in any manner, as salary, compensation or bonus in determining the amount of any payment under any health and welfare, pension, retirement or other employee benefit plan, program or policy of the Company or any Affiliate.

14.      No change or modification of this Agreement (other than changes to the Plan) shall be valid unless it is in writing and signed by the parties hereto.

15.      The validity and construction of this Agreement shall be governed by the laws of the State of Delaware, without regard to the conflicts of law principles thereof.

16.      This Agreement, together with the Plan, sets forth all of the promises, agreements, conditions, understandings, warranties and representations between the parties hereto regarding the Stock Units, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, between them regarding the Stock Units other than as set forth herein or therein. This Agreement is made under and subject to the provisions of

the Plan, and all of the provisions of the Plan are also provisions of this Agreement.  If there is a difference or conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan will govern.

17.    The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Code ("Section 409A") to the extent subject thereto, and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted and be administered consistent with such intent.  Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, the Grantee shall not be considered to have terminated employment with the Company for purposes of this Agreement and no payment shall be due to the Grantee under Section 3 of this Agreement until the Grantee would be considered to have incurred a "separation from service" from the Company within the meaning of Section 409A.  Any payments that are due within the "short term deferral period" as defined in Section 409A shall not be treated as deferred compensation unless applicable law requires otherwise.  Notwithstanding anything to the contrary in this Agreement or the Plan, to the extent that any Stock Units or other amounts are payable upon a "separation from service" and such settlement or payment would result in the imposition of any additional tax and penalties imposed under Section 409A, the settlement and payment of such Stock Units shall instead be made on the first business day after the date that is six (6) months following such separation from service (or death, if earlier) to the extent any such delay would avoid the imposition of such tax or penalty.  In addition, each amount to be paid or benefit to be provided to the Grantee pursuant to this Agreement, which constitutes deferred compensation subject to Section 409A, shall be construed as a separate identified payment for purposes of Section 409A.

18.    As used in this Agreement and the Plan, "the Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets, whether direct or indirect, by purchase, merger, consolidation, the transfer of property, stock or goodwill or otherwise.  This Agreement shall automatically inure to the benefit of, and be enforceable by the Company, including its successors, and assigns, without the need for any further action or approval by Grantee.  Grantee specifically agrees that this Agreement may be assigned by the Company and enforced by any assignee or successor of the Company.

**By acknowledging this Agreement in a method to be determined by the Company, the Grantee accepts and agrees to all of the foregoing terms and provisions and to all of the terms and provisions of the Plan incorporated herein by reference and confirms that he/she has received a copy of the Plan.  The provisions in this Agreement shall not supersede, modify, replace or cancel any existing contractual obligations, including but not limited to restrictive covenants, applicable to the Grantee in _any_ employment agreement, offer letter, prior equity award agreements or other agreement with the Company.**

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by a duly authorized representative as of the Grant Date.

KCG HOLDINGS, INC.

By:
Daniel B. Coleman
Chief Executive Officer

SC1:3763203.3

2015 Year-End Version (US)

KCG HOLDINGS, INC.
AMENDED AND RESTATED EQUITY INCENTIVE PLAN
RESTRICTED STOCK UNIT AGREEMENT

Name of Grantee:                          ROHIT KHANDEKAR

Restricted Stock Units:                   8,010 Restricted Stock Units ("Stock Units")

Grant Date:                               02/03/2016

Grant Number:                             A0008360

Dates Upon Which          1.  2,670 Stock Units, on 02/03/2017
Restrictions Lapse:       2.  2,670 Stock Units, on 02/03/2018
(subject to accelerated    3.  2,670 Stock Units, on 02/03/2019
lapse of restrictions as
set forth in Section 3(a)
of this Agreement)

          *       *       *       *       *       *       *       *

          This Restricted Stock Unit Agreement (the "Agreement") is entered into as of the Grant
Date by and between KCG Holdings, Inc. and any successor entity (collectively, the "Company") and the
Grantee.  The Grantee and the Company hereby agree as follows:

1.        The Company, pursuant to the Company's Amended and Restated Equity Incentive Plan (the
          "Plan"), which is incorporated herein by reference, and subject to the terms and conditions
          thereof, hereby grants to the Grantee the above mentioned Stock Units.  Any capitalized term, to
          the extent not defined herein, shall have the same meaning as set forth in the Plan.

2.        For purposes of this Agreement, the "Restricted Vesting Period" means the period from the Grant
          Date until the date on which the vesting restrictions applicable to Stock Units lapse.  Except as
          set forth in Section 3 of this Agreement, all restrictions imposed on the Stock Units shall lapse
          upon the expiration of the Restricted Vesting Period applicable to such Stock Units, and upon
          the expiration of the Restricted Vesting Period applicable to each such Stock Unit, the Company
          shall deliver to the Grantee, for each Stock Unit, a share of Common Stock, $.01 par value, of
          KCG Holdings, Inc. ("Shares").

3.        Except as otherwise provided for in a Grantee's offer letter or employment agreement with the
          Company or an Affiliate, if applicable:

          (a)       if the Grantee's employment with, or provision of services to, the Company or any of its
                    Affiliates is terminated by the Company or any of its Affiliates without Cause, or
                    otherwise terminates on account of the Grantee's death or Disability, the restrictions
                    applicable to the Stock Units shall lapse (subject to the forfeiture provisions of the
                    Plan), and the Stock Units shall be deemed fully vested in accordance with the terms of
                    the Plan;

          (b)       if the Grantee's employment with, or provision of services to, the Company or any of its
                    Affiliates is terminated for Cause, all Stock Units held by the Grantee still subject to
                    restrictions shall be forfeited upon such termination; and

(c)     subject to Section 4, if the Grantee's employment with, or provision of services to, the Company or any of its Affiliates terminates for any reason other than as set forth in Sections 3(a) and 3(b), all Stock Units held by the Grantee still subject to restrictions shall continue to vest as if such Grantee's employment with the Company or any of its Affiliates had continued.

For purposes of this Agreement, "Disability" shall mean that the Grantee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

4.     All Stock Units held by the Grantee still subject to restrictions shall be forfeited if during the Restricted Vesting Period, Grantee breaches or otherwise takes any action that is prohibited by an Applicable Restrictive Covenant.

For purposes of this Agreement, "Applicable Restrictive Covenant" shall include (i) any restrictive covenant provision (including, but not limited to a non-competition, non-solicitation and/or confidentiality restriction) applicable to Grantee under a prior offer letter, employment agreement, award agreement or other agreement Grantee has with the Company and (ii) to the extent Grantee is not subject to a restrictive covenant provision as provided in clause (i) at the Grant Date, the restrictive covenant provisions set forth on Annex A of this Agreement.

5.     Grantee acknowledges that as a condition to accepting Shares delivered in respect of Stock Units, Grantee may be required to certify to the Company, in the form and manner determined by the Company in its sole discretion, that Grantee has complied with all terms and conditions of the Plan and this Agreement, including, but not limited to the Applicable Restrictive Covenants.  If the Company determines, in its sole discretion, that Grantee has failed to comply with all terms and conditions of the Plan and this Agreement, all Stock Units held by the Grantee still subject to restrictions shall be forfeited.

6.     The Stock Units shall be appropriately adjusted to reflect any stock dividend, stock split, combination or exchange of shares or other change in capitalization with a similar substantive effect upon the Plan, the Shares or the Stock Units.  The Committee shall have the power and sole discretion to determine the nature and amount of the adjustment to be made, if any.  Any adjustment so made shall be final and binding.

7.     The Grantee shall have no rights as a stockholder of the Company, no dividend rights (except as expressly provided below) and no voting rights, with respect to the Stock Units and any Shares underlying or issuable in respect of such Stock Units until such Shares are actually issued to and held of record by the Grantee.  Notwithstanding the above, on the date Shares are actually issued to the Grantee in respect of a Stock Unit, the Company shall pay the Grantee an amount in cash equal to the aggregate amount of the ordinary cash dividends (if any) paid by the Company on a Share for which the related dividend payment record date(s) occurred on or after the Grant Date and on or before the date such Stock Unit became vested pursuant to the terms hereof (the right to receive such payment is referred to herein as a "Dividend Equivalent Right").  For purposes of clarity, no interest shall accrue with respect to the period between the dividend payment record date and the date of payment of any Dividend Equivalent Rights, and no Dividend Equivalent Rights shall be paid with respect to any Stock Units that terminate pursuant to Sections 3(b), 4 or 5.

8.     The Company shall withhold all applicable taxes required by law from all amounts paid in respect of the Stock Units upon the vesting of, or lapse of restrictions on, or payment of, any or all of the Stock Units.  The Grantee may satisfy the withholding obligation by paying the amount of any taxes in cash or, with the approval of the Committee, shares of stock may be deducted from the payment to satisfy the obligation in full or in part.  The amount of the withholding and the number of shares to be deducted shall be determined by the Committee with reference to the Fair Market Value of the stock when the withholding is required to be made.

9.     The Grantee specifically acknowledges that the Stock Units and any Shares or cash delivered in settlement thereof are subject to the provisions of Section 13.4 of the Plan, entitled "Recapture; Adjustment of Awards," and the Company's Compensation Recoupment Policy, if applicable to the Grantee, which can cause the forfeiture of any gain realized upon the vesting of the Stock Units and/or the cancellation or adjustment of any grant of Stock Units.

10.    If the Grantee attempts to have any dispute that arises out of or relates to this Agreement resolved in any manner that is not provided for by Sections 14.13 (entitled "Choice of Forum") or 14.14 (entitled "Dispute Resolution") of the Plan, then (i) all outstanding Stock Units awarded to the Grantee under this Agreement shall be forfeited, and (ii) any gain realized by the Grantee from the delivery of any Shares or cash in settlement of the Stock Units awarded under this Agreement shall be paid by the Grantee to the Company upon notice from the Company.

11.     Except with the consent of the Committee, no Stock Units shall be assignable or transferable except by will or by the laws of descent and distribution while such Stock Units remain subject to restrictions.

12.     Nothing herein shall obligate the Company or any Subsidiary or Affiliate of the Company to continue the Grantee's service for any particular period or on any particular basis of compensation.

13.     The obligation of the Company to deliver Shares or cash in respect of Stock Units granted under this Agreement is specifically subject to all provisions of the Plan and all applicable laws, rules, regulations and governmental and stockholder approvals.

14.    Any notice by the Grantee to the Company hereunder shall be in writing and shall be deemed duly given only upon receipt thereof by the Company at its principal offices.  Any notice by the Company to the Grantee shall be in writing and shall be deemed duly given if mailed to the Grantee at the address last specified to the Company by the Grantee.

15.    The grant of Stock Units herein is not enforceable until this Agreement has been signed by the Company and acknowledged by the Grantee.  By acknowledging this Agreement, the Grantee shall be deemed to have accepted and consented to any action taken under the Plan by the Committee, the Board or its delegates, and shall be deemed to have agreed that these Stock Units are special incentive compensation that will not be taken into account, in any manner, as salary, compensation or bonus in determining the amount of any payment under any health and welfare, pension, retirement or other employee benefit plan, program or policy of the Company or any Affiliate.

16.    No change or modification of this Agreement (other than changes to the Plan) shall be valid unless it is in writing and signed by the parties hereto.

17.    The validity and construction of this Agreement shall be governed by the laws of the State of Delaware, without regard to the conflicts of law principles thereof.

18.    This Agreement, together with the Plan, sets forth all of the promises, agreements, conditions, understandings, warranties and representations between the parties hereto regarding the Stock Units, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, between them regarding the Stock Units other than as set forth herein or therein.  This Agreement is made under and subject to the provisions of the Plan, and all of the provisions of the Plan are also provisions of this Agreement. If there is a difference or conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan will govern.

19.    The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Code ("Section 409A") to the extent subject thereto, and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted and be administered consistent with such intent.  Notwithstanding anything contained herein to the contrary, to the extent

required in order to avoid accelerated taxation and/or tax penalties under Section 409A, the Grantee shall not be considered to have terminated employment with the Company for purposes of this Agreement and no payment shall be due to the Grantee under Section 3(a) of this Agreement until the Grantee would be considered to have incurred a "separation from service" from the Company within the meaning of Section 409A.  Any payments that are due within the "short term deferral period" as defined in Section 409A shall not be treated as deferred compensation unless applicable law requires otherwise.  Notwithstanding anything to the contrary in this Agreement or the Plan, to the extent that any Stock Units or other amounts are payable upon a "separation from service" and such settlement or payment would result in the imposition of any additional tax and penalties imposed under Section 409A, the settlement and payment of such Stock Units shall instead be made on the first business day after the date that is six (6) months following such separation from service (or death, if earlier) to the extent any such delay would avoid the imposition of such tax or penalty.  In addition, each amount to be paid or benefit to be provided to the Grantee pursuant to this Agreement, which constitutes deferred compensation subject to Section 409A, shall be construed as a separate identified payment for purposes of Section 409A.

20.   As used in this Agreement and the Plan, "the Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets, whether direct or indirect, by purchase, merger, consolidation, the transfer of property, stock or goodwill or otherwise.  This Agreement shall automatically inure to the benefit of, and be enforceable by the Company, including its successors, and assigns, without the need for any further action or approval by Grantee.  Grantee specifically agrees that this Agreement may be assigned by the Company and enforced by any assignee or successor of the Company.

**By acknowledging this Agreement in a method to be determined by the Company, the Grantee accepts and agrees to all of the foregoing terms and provisions and to all of the terms and provisions of the Plan incorporated herein by reference and confirms that he/she has received a copy of the Plan.  The provisions in this Agreement (including, without limitation, the Applicable Restrictive Covenants) shall not supersede, modify, replace or cancel any existing contractual obligations, including but not limited to restrictive covenants, applicable to the Grantee in _any_ employment agreement, offer letter, prior equity award agreements or other agreement with the Company.**

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by a duly authorized representative as of the Grant Date.

KCG HOLDINGS, INC.

By:   _____

Daniel B. Coleman
Chief Executive Officer

**Annex A**

| |
|---|
| This Annex A is incorporated into and comprises part of your Agreement.  Capitalized terms that are not defined in the body of this Annex A are defined in the Agreement. |

a)    During the Restricted Vesting Period, Grantee agrees to not, directly or indirectly, alone or in association with or on behalf of any other person, engage in any Competitive Activity.

    i.    "*Competitive Activity*" means:

        A.   Engaging in a Competitive Business for Grantee's own benefit or for the benefit of any other person;

        B.   Providing services to any person engaged in a Competitive Business, whether as an employee, consultant, officer, director, manager, partner, principal, agent, or in any other capacity, that are similar to the services Grantee provided for Company or that Grantee possessed Confidential Information about while employed by Company; or

        C.   Controlling (by contract, equity ownership or otherwise), investing in (except as the owner of up to 3% of the securities of a publicly traded entity) or providing other financial support to any person engaged in a Competitive Business.

    ii.   "*Competitive Business*" means:

        A.   Engaging in high frequency algorithmic transactions in any way involving any electronically tradeable product or commodity (including any security (equity or debt), derivatives, fixed income, cash, currency, or other financial instruments, or any other tangible or intangible item) through any exchange, electronic trading venue or platform, whether or not using proprietary trading methods or systems, in which Company was engaged at the time Grantee's employment for Company terminates, or in which Company engaged during the 12 months preceding the termination of Grantee's employment, or in which Company has plans to engage in at the time of the termination of Grantee's employment and that Grantee was aware of, or possessed Confidential Information about, at the time of the termination of Grantee's employment; or

        B.   Engaging in any activities that are similar to, competitive with or a functional substitute for activities or Confidential Information Grantee had knowledge of and that Company engaged in or planned to engage in at any time during the 12 months preceding the termination of Grantee's employment.

        C.   "High frequency algorithmic transactions" means buying, selling, trading, or engaging in any other similar transaction where orders are determined by an automated model and placed on an automated basis.

b)    During the Restricted Vesting Period, Grantee agree*s* to not directly or indirectly, alone or in association with or on behalf of any other person contact or solicit any client or potential client introduced to Grantee by Company, or that Grantee knew of or about solely as a result of Grantee's employment with Company, for the purpose of offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by, distributed by, or sold by Company.

For purposes of this Annex A, a "potential client" is a person, company, and/or entity that Grantee had direct contact with or possessed Confidential Information about during the last 18 months of Grantee's Company employment, as well as any person, company or entity Grantee knew Company was contacting during the last 18 months of Grantee's employment regarding the use of Company products or services.

c)    During the Restricted Vesting Period, Grantee will not, directly or indirectly, alone or in association with or on behalf of any other person:

    i.    Induce or solicit any person who is an employee or consultant to Company to terminate their employment or engagement with Company or modify their relationship with Company in a way that is adverse to Company; or hire or otherwise use the services of any person

who provided services to Company as an employee or consultant (other than services offered generically to the public by such person, e.g., telecommunications services) within 12 months prior to Grantee's termination for purposes of engaging in a Competitive Business;

    ii.        Interfere with or induce any person to make a material adverse change in any business relationship between Company and its suppliers, members, lenders, business partners and any other person in a business relationship with Company where Company has a reasonable expectation that the relationship would continue without such change; or

    iii.        Participate or engage in any trade or commercial disparagement of the business or operations of Company and/or disparage the professional and/or personal lives of any individual manager, officer or employee of Company, or give interviews, provide comment, information or opinions, positive or negative, to any publicly available media resource or employee, contractor or representative, regardless of the format and intent of that media.

d)    Grantee will not engage in any unauthorized use or disclosure of the Company's Confidential Information. "Confidential Information" means any information of or about the Company that is not generally known to the public, including (i) information that can be used in the operation of the Company's business and is sufficiently valuable and secret to afford the Company with actual or potential economic advantage, (ii) all forms of financial, business, employee, technical, economic, engineering and design information, plans and strategies, forecasts, know-how, systems, processes, software, algorithms, mathematical models, valuation models, trading models or strategies, information relating to modeling relationships among interest rate market instruments, trading and hedging strategies and paradigms, firmware, trading technologies, the use of trading platform software (including all front-end, middleware and exchange connectivity components or subsystems and analysis and conclusions related to the Company's technology), proprietary computer code, computer and network hardware and configurations not generally known to the public and in all events whether tangible or intangible and whether or not stored, compiled or memorialized physically, electronically, graphically, photographically or in any other media, (iii) information that is a trade secret or is subject to trade secret or similar regulation under any state or federal statute or regulation, (iv) confidential or secret information of or about other persons that is known to the Company, and (v) information labeled "confidential" or otherwise marked with a restriction on disclosure. Confidential Information does not include any information that is or becomes generally known to the public without the breach of any duty by me or any other person, or through improper means.

e)    During the Restricted Vesting Period and at all times thereafter, Grantee will:

    i.    Hold all Confidential Information as a fiduciary in trust and use it only for the benefit of the Company in properly performing Grantee's employment duties for the Company;

    ii.    Maintain Confidential Information in strict confidence and secrecy;

    iii.    Not, except as specifically directed by the Company in performing employment duties for the Company, communicate or disclose Confidential Information in any manner to any person within or outside the Company who is not authorized to know, use or receive such Confidential Information; and

    iv.    Comply with the Company's procedures on dealing with Confidential Information and in all events use best efforts to prevent the inadvertent disclosure of Confidential Information.

    v.    If subject to a valid subpoena, or other order of any governmental entity or similar legal requirement that might seek disclosure of Confidential Information, and to the extent permitted by law, furnish a copy of such subpoena, order or other legal requirement to the Company's General Counsel as soon as practicable, but no later than 48 hours after Grantee receives it, cooperate with the Company's efforts to obtain a protective order or similar relief, and only disclose the minimum amount of Confidential Information necessary.

vi.    At any time upon the Company's request and within 48 hours of Grantee's termination of employment with the Company, deliver all Confidential Information in Grantee's possession to the Company and not retain any originals or copies of the Confidential Information.

vii.    Not disclose to the Company any confidential or proprietary information belonging to any other person that Grantee is under any obligation to keep in confidence.

2016 Year-End Version (US)

KCG HOLDINGS, INC.
AMENDED AND RESTATED EQUITY INCENTIVE PLAN
RESTRICTED STOCK UNIT AGREEMENT

Name of Grantee:                    ROHIT KHANDEKAR

Restricted Stock Units:             3,569 Restricted Stock Units ("Stock Units")

Grant Date:                         01/24/2017

Grant Number:                       A0008931

Dates Upon Which                    1. 1,190 Stock Units, on 01/24/2018
Restrictions Lapse:                 2. 1,190 Stock Units, on 01/24/2019
(subject to accelerated             3. 1,189 Stock Units, on 01/24/2020
lapse of restrictions as
set forth in Section 3(a)
of this Agreement)

        *       *       *       *       *       *       *       *

        This Restricted Stock Unit Agreement (the "Agreement") is entered into as of the Grant Date by
and between KCG Holdings, Inc. and any successor entity (collectively, the "Company") and the Grantee.  The
Grantee and the Company hereby agree as follows:

1.      The Company, pursuant to the Company's Amended and Restated Equity Incentive Plan (the "Plan"),
        which is incorporated herein by reference, and subject to the terms and conditions thereof, hereby grants
        to the Grantee the above mentioned Stock Units.  Any capitalized term, to the extent not defined herein,
        shall have the same meaning as set forth in the Plan.

2.      For purposes of this Agreement, the "Restricted Vesting Period" means the period from the Grant Date
        until the date on which the vesting restrictions applicable to Stock Units lapse.  Except as set forth in
        Section 3 of this Agreement, all restrictions imposed on the Stock Units shall lapse upon the expiration
        of the Restricted Vesting Period applicable to such Stock Units, and upon the expiration of the Restricted
        Vesting Period applicable to each such Stock Unit, the Company shall deliver to the Grantee, for each
        Stock Unit, a share of Common Stock, $.01 par value, of KCG Holdings, Inc. ("Shares").

3.      Except as otherwise provided for in a Grantee's offer letter or employment agreement with the Company
        or an Affiliate, if applicable:

        (a)     if the Grantee's employment with, or provision of services to, the Company or any of its Affiliates
                is terminated by the Company or any of its Affiliates without Cause, or otherwise terminates on
                account of the Grantee's death or Disability, the restrictions applicable to the Stock Units shall
                lapse (subject to the forfeiture provisions of the Plan), and the Stock Units shall be deemed fully
                vested in accordance with the terms of the Plan;

        (b)     if the Grantee's employment with, or provision of services to, the Company or any of its Affiliates
                is terminated for Cause, all Stock Units held by the Grantee still subject to restrictions shall be
                forfeited upon such termination; and

        (c)     if the Grantee's employment with, or provision of services to, the Company or any of its Affiliates
                terminates for any reason other than as set forth in Sections 3(a) and 3(b), all Stock Units held
                by the Grantee still subject to restrictions shall continue to vest as if such Grantee's employment

Case 1:17-cv-03533-AJN-GWG    Document 102-9    Filed 10/10/17    Page 35 of 47

with the Company or any of its Affiliates had continued, subject to Section 4 which will continue to apply through the remainder of the Restricted Vesting Period.

For purposes of this Agreement, "Disability" shall mean that the Grantee is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

4.    All Stock Units held by the Grantee still subject to restrictions shall be forfeited if during the Restricted Vesting Period, the Grantee breaches or otherwise takes any action that is prohibited by an Applicable Restrictive Covenant.  The Grantee understands that eligibility for the continued vesting of his or her Stock Units pursuant to Section 3(c) is contingent on the Grantee's ongoing compliance with the Applicable Restrictive Covenants for the duration of the Restricted Vesting Period regardless of the length of the protected period or similar restrictive covenant period which the Grantee is required to comply under an employment agreement, offer letter, award agreement or other agreement with the Company.

For purposes of this Agreement, "Applicable Restrictive Covenant" shall include (i) any restrictive covenant provision (including, but not limited to a non-competition, non-solicitation and/or confidentiality restriction) applicable to the Grantee under a prior offer letter, employment agreement, award agreement or other agreement the Grantee has with the Company and (ii) to the extent the Grantee is not subject to a restrictive covenant provision as provided in clause (i) at the Grant Date, the restrictive covenant provisions set forth on Annex A of this Agreement (which, for purposes of this Agreement shall be deemed to apply for the duration of the Restricted Vesting Period).

5.    The Grantee acknowledges that as a condition to accepting Shares delivered in respect of Stock Units, the Grantee may be required to certify to the Company, in the form and manner determined by the Company in its sole discretion, that the Grantee has complied with all terms and conditions of the Plan and this Agreement, including, but not limited to the Applicable Restrictive Covenants.  The Grantee understands and agrees that:

(a)    if the Company determines, in its sole discretion, that the Grantee has failed to comply with all terms and conditions of the Plan and this Agreement, all Stock Units held by the Grantee still subject to restrictions shall be forfeited; and

(b)    (i) the Grantee's address on file with the Company at the time any certification is required will be deemed to be his or her current address, (ii) it is the Grantee's responsibility to inform the Company of any changes to his or her address to ensure timely receipt of the certification materials, (iii) the Grantee is responsible for contacting the Company to obtain such certification materials if not received and (iv) the Grantee's failure to return properly completed certification materials by the specified deadline (which includes the failure to timely return the completed certification because he or she did not provide the Company with updated contact information) will result in the cancellation of the Grantee's Stock Units without any payment.  For the avoidance of doubt, references in this Section 5(b) to the Grantee's address are inclusive of the Grantee's email address and references to the Grantee's receipt and return of certification materials are inclusive of such actions taken by means of electronic communication.

6.    The Stock Units shall be appropriately adjusted to reflect any stock dividend, stock split, combination or exchange of shares or other change in capitalization with a similar substantive effect upon the Plan, the Shares or the Stock Units.  The Committee shall have the power and sole discretion to determine the nature and amount of the adjustment to be made, if any.  Any adjustment so made shall be final and binding.

7.    The Grantee shall have no rights as a stockholder of the Company, no dividend rights (except as expressly provided below) and no voting rights, with respect to the Stock Units and any Shares underlying or issuable in respect of such Stock Units until such Shares are actually issued to and held of record by the Grantee.  Notwithstanding the above, on the date Shares are actually issued to the Grantee in respect of a Stock Unit, the Company shall pay the Grantee an amount in cash equal to the aggregate amount of the

ordinary cash dividends (if any) paid by the Company on a Share for which the related dividend payment record date(s) occurred on or after the Grant Date and on or before the date such Stock Unit became vested pursuant to the terms hereof (the right to receive such payment is referred to herein as a "Dividend Equivalent Right"). For purposes of clarity, no interest shall accrue with respect to the period between the dividend payment record date and the date of payment of any Dividend Equivalent Rights, and no Dividend Equivalent Rights shall be paid with respect to any Stock Units that terminate pursuant to Sections 3(b), 4 or 5.

8.    The Company shall withhold all applicable taxes required by law from all amounts paid in respect of the Stock Units upon the vesting of, or lapse of restrictions on, or payment of, any or all of the Stock Units. The Grantee may satisfy the withholding obligation by paying the amount of any taxes in cash or, with the approval of the Committee, shares of stock may be deducted from the payment to satisfy the obligation in full or in part. The amount of the withholding and the number of shares to be deducted shall be determined by the Committee with reference to the Fair Market Value of the stock when the withholding is required to be made.

9.    The Grantee specifically acknowledges that the Stock Units and any Shares or cash delivered in settlement thereof are subject to the provisions of Section 13.4 of the Plan, entitled "Recapture; Adjustment of Awards," and the Company's Compensation Recoupment Policy, if applicable to the Grantee, which can cause the forfeiture of any gain realized upon the vesting of the Stock Units and/or the cancellation or adjustment of any grant of Stock Units.

10.    If the Grantee attempts to have any dispute that arises out of or relates to this Agreement resolved in any manner that is not provided for by Sections 14.13 (entitled "Choice of Forum") or 14.14 (entitled "Dispute Resolution") of the Plan, then (i) all outstanding Stock Units awarded to the Grantee under this Agreement (whether vested or unvested) shall be forfeited and (ii) any gain realized by the Grantee from the delivery of any Shares or cash in settlement of the Stock Units awarded under this Agreement shall be paid by the Grantee to the Company upon notice from the Company in the manner required by Section 13.4 of the Plan.

11.    Except with the consent of the Committee, no Stock Units shall be assignable or transferable except by will or by the laws of descent and distribution while such Stock Units remain subject to restrictions.

12.    Nothing herein shall obligate the Company or any Subsidiary or Affiliate of the Company to continue the Grantee's service for any particular period or on any particular basis of compensation.

13.    The obligation of the Company to deliver Shares or cash in respect of Stock Units granted under this Agreement is specifically subject to all provisions of the Plan and all applicable laws, rules, regulations and governmental and stockholder approvals.

14.    Any notice by the Grantee to the Company hereunder shall be in writing and shall be deemed duly given only upon receipt thereof by the Company at its principal offices. Any notice by the Company to the Grantee shall be in writing and shall be deemed duly given if mailed to the Grantee at the address last specified to the Company by the Grantee.

15.    The grant of Stock Units herein is not enforceable until this Agreement has been signed by the Company and acknowledged by the Grantee. By acknowledging this Agreement, the Grantee shall be deemed to have accepted and consented to any action taken under the Plan by the Committee, the Board or its delegates, and shall be deemed to have agreed that these Stock Units are discretionary incentive compensation that will not be taken into account, in any manner, as salary, compensation or bonus in determining the amount of any payment under any health and welfare, pension, retirement or other employee benefit plan, program or policy of the Company or any Affiliate.

16.    No change or modification of this Agreement (other than changes to the Plan) shall be valid unless it is in writing and signed by the parties hereto.

17.    The validity and construction of this Agreement shall be governed by the laws of the State of Delaware, without regard to the conflicts of law principles thereof.

18.        This Agreement, together with the Plan, sets forth all of the promises, agreements, conditions, understandings, warranties and representations between the parties hereto regarding the Stock Units, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, between them regarding the Stock Units other than as set forth herein or therein. This Agreement is made under and subject to the provisions of the Plan, and all of the provisions of the Plan are also provisions of this Agreement. If there is a difference or conflict between the provisions of this Agreement and the provisions of the Plan, the provisions of the Plan will govern.

19.    The intent of the parties is that payments and benefits under this Agreement comply with Section 409A of the Code ("Section 409A") to the extent subject thereto, and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted and be administered consistent with such intent. Notwithstanding anything contained herein to the contrary, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A, the Grantee shall not be considered to have terminated employment with the Company for purposes of this Agreement and no payment shall be due to the Grantee under Section 3(a) of this Agreement until the Grantee would be considered to have incurred a "separation from service" from the Company within the meaning of Section 409A. Any payments that are due within the "short term deferral period" as defined in Section 409A shall not be treated as deferred compensation unless applicable law requires otherwise. Notwithstanding anything to the contrary in this Agreement or the Plan, to the extent that any Stock Units or other amounts are payable upon a "separation from service" and such settlement or payment would result in the imposition of any additional tax and penalties imposed under Section 409A, the settlement and payment of such Stock Units shall instead be made on the first business day after the date that is six (6) months following such separation from service (or death, if earlier) to the extent any such delay would avoid the imposition of such tax or penalty. In addition, each amount to be paid or benefit to be provided to the Grantee pursuant to this Agreement, which constitutes deferred compensation subject to Section 409A, shall be construed as a separate identified payment for purposes of Section 409A.

20.    As used in this Agreement and the Plan, "the Company" shall mean the Company as hereinbefore defined and any successor to its business and/or assets, whether direct or indirect, by purchase, merger, consolidation, the transfer of property, stock or goodwill or otherwise. This Agreement shall automatically inure to the benefit of, and be enforceable by the Company, including its successors, and assigns, without the need for any further action or approval by the Grantee. The Grantee specifically agrees that this Agreement may be assigned by the Company and enforced by any assignee or successor of the Company.

**By acknowledging this Agreement in a method to be determined by the Company, the Grantee accepts and agrees to all of the foregoing terms and provisions and to all of the terms and provisions of the Plan incorporated herein by reference and confirms that he/she has received a copy of the Plan. The provisions in this Agreement (including, without limitation, the Applicable Restrictive Covenants) shall not supersede, modify, replace or cancel any existing contractual obligations, including but not limited to restrictive covenants, applicable to the Grantee in _any_ employment agreement, offer letter, prior equity award agreements or other agreement with the Company.**

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by a duly authorized representative as of the Grant Date.

KCG HOLDINGS, INC.

By:_____
        Daniel B. Coleman
        Chief Executive Officer

**Annex A**

> This Annex A is incorporated into and comprises part of your Agreement. Capitalized terms that are not defined in the body of this Annex A are defined in the Agreement.

a) During the Restricted Vesting Period, the Grantee agrees to not, directly or indirectly, alone or in association with or on behalf of any other person, engage in any Competitive Activity.

    i. "*Competitive Activity*" means:

        A. Engaging in a Competitive Business for the Grantee's own benefit or for the benefit of any other person;

        B. Providing services to any person engaged in a Competitive Business, whether as an employee, consultant, officer, director, manager, partner, principal, agent, or in any other capacity, that are similar to the services the Grantee provided for Company or that the Grantee possessed Confidential Information about while employed by Company; or

        C. Controlling (by contract, equity ownership or otherwise), investing in (except as the owner of up to 3% of the securities of a publicly traded entity) or providing other financial support to any person engaged in a Competitive Business.

    ii. "*Competitive Business*" means:

        A. Engaging in high frequency algorithmic transactions in any way involving any electronically tradeable product or commodity (including any security (equity or debt), derivatives, fixed income, cash, currency, or other financial instruments, or any other tangible or intangible item) through any exchange, electronic trading venue or platform, whether or not using proprietary trading methods or systems, in which the Company was engaged at the time the Grantee's employment for the Company terminates, or in which the Company engaged during the 12 months preceding the termination of the Grantee's employment, or in which the Company has plans to engage in at the time of the termination of the Grantee's employment and that the Grantee was aware of, or possessed Confidential Information about, at the time of the termination of the Grantee's employment; or

        B. Engaging in any activities that are similar to, competitive with or a functional substitute for activities or Confidential Information the Grantee had knowledge of and that Company engaged in or planned to engage in at any time during the 12 months preceding the termination of the Grantee's employment.

        C. "High frequency algorithmic transactions" means buying, selling, trading, or engaging in any other similar transaction where orders are determined by an automated model and placed on an automated basis.

b) During the Restricted Vesting Period, the Grantee agrees to not directly or indirectly, alone or in association with or on behalf of any other person contact or solicit any client or potential client introduced to the Grantee by the Company, or that Grantee knew of or about solely as a result of the Grantee's employment with Company, for the purpose of offering, providing or selling, products or services competitive with or similar to products or services offered by, developed by, designed by, distributed by, or sold by the Company.

For purposes of this Annex A, a "potential client" is a person, company, and/or entity that the Grantee had direct contact with or possessed Confidential Information about during the last 18 months of the Grantee's Company employment, as well as any person, company or entity the Grantee knew the Company was contacting during the last 18 months of the Grantee's employment regarding the use of Company products or services.

c) During the Restricted Vesting Period, Grantee will not, directly or indirectly, alone or in association with or on behalf of any other person:

    i.   Induce or solicit any person who is an employee or consultant to Company to terminate their employment or engagement with the Company or modify their relationship with the Company in a way that is adverse to the Company; or hire or otherwise use the services of any person who provided services to the Company as an employee or consultant (other than services offered generically to the public by such person, e.g., telecommunications services) within 12 months prior to the Grantee's termination for purposes of engaging in a Competitive Business;

    ii.   Interfere with or induce any person to make a material adverse change in any business relationship between the Company and its suppliers, members, lenders, business partners and any other person in a business relationship with the Company where the Company has a reasonable expectation that the relationship would continue without such change; or

    iii.   Participate or engage in any trade or commercial disparagement of the business or operations of the Company and/or disparage the professional and/or personal lives of any individual manager, officer or employee of the Company, or give interviews, provide comment, information or opinions, positive or negative, to any publicly available media resource or employee, contractor or representative, regardless of the format and intent of that media.

d)   The Grantee will not engage in any unauthorized use or disclosure of the Company's Confidential Information. "Confidential Information" means any information of or about the Company that is not generally known to the public, including (i) information that can be used in the operation of the Company's business and is sufficiently valuable and secret to afford the Company with actual or potential economic advantage, (ii) all forms of financial, business, employee, technical, economic, engineering and design information, plans and strategies, forecasts, know-how, systems, processes, software, algorithms, mathematical models, valuation models, trading models or strategies, information relating to modeling relationships among interest rate market instruments, trading and hedging strategies and paradigms, firmware, trading technologies, the use of trading platform software (including all front-end, middleware and exchange connectivity components or subsystems and analysis and conclusions related to the Company's technology), proprietary computer code, computer and network hardware and configurations not generally known to the public and in all events whether tangible or intangible and whether or not stored, compiled or memorialized physically, electronically, graphically, photographically or in any other media, (iii) information that is a trade secret or is subject to trade secret or similar regulation under any state or federal statute or regulation, (iv) confidential or secret information of or about other persons that is known to the Company, and (v) information labeled "confidential" or otherwise marked with a restriction on disclosure. Confidential Information does not include any information that is or becomes generally known to the public without the breach of any duty by me or any other person, or through improper means.

e)   During the Restricted Vesting Period and at all times thereafter, the Grantee will:

    i.   Hold all Confidential Information as a fiduciary in trust and use it only for the benefit of the Company in properly performing the Grantee's employment duties for the Company;

    ii.   Maintain Confidential Information in strict confidence and secrecy;

    iii.   Not, except as specifically directed by the Company in performing employment duties for the Company, communicate or disclose Confidential Information in any manner to any person within or outside the Company who is not authorized to know, use or receive such Confidential Information; and

    iv.   Comply with the Company's procedures on dealing with Confidential Information and in all events use best efforts to prevent the inadvertent disclosure of Confidential Information.

    v.   If subject to a valid subpoena, or other order of any governmental entity or similar legal requirement that might seek disclosure of Confidential Information, and to the extent permitted by law, furnish a copy of such subpoena, order or other legal requirement to the Company's General Counsel as soon as practicable, but no later than 48 hours after Grantee receives it, cooperate with the Company's efforts to obtain a protective order or similar relief, and only disclose the minimum amount of Confidential Information necessary.

vi.    At any time upon the Company's request and within 48 hours of the Grantee's termination of employment with the Company, deliver all Confidential Information in the Grantee's possession to the Company and not retain any originals or copies of the Confidential Information.

vii.    Not disclose to the Company any confidential or proprietary information belonging to any other person that the Grantee is under any obligation to keep in confidence.

f)    Nothing in any in any code, agreement, manual or in any other policies, procedures or agreements of the Company (including this Agreement and the Plan) shall prohibit or restrict any current or former Company employee or their counsel from providing information in connection with: (a) any disclosure of information required by law or legal process, (b) reporting possible violations of federal or state law or regulation to any governmental agency, commission or entity, including but not limited to, the Department of Justice, the Commodities Futures Trading Commission, the Securities and Exchange Commission, the Department of Labor, the Congress, any state Attorney General, self-regulatory organization and any agency Inspector General (collectively "Government Agencies"), (c) filing a charge or complaint with Government Agencies, (d) making disclosures that are protected under the whistleblower provisions of federal or state law or regulation (collectively the "Whistleblower Statutes"), or (e) from initiating communications directly with, responding to any inquiry from, volunteering information to, testifying or otherwise participating in or assisting in any inquiry, investigation or proceeding brought by Government Agencies in connection with (a) through (d). Any current or former Company employee is not required to advise or seek permission from the Company before engaging in any activity set forth in (a) through (e). Further, the Company does not in any manner limit the right of any current or former Company employee to receive an award from Government Agencies for information provided to Government Agencies or pursuant to the Whistleblower Statutes.

300 Vesey Street
New York, NY 10282
Tel: 1 212 418 0100
Fax: 1 212 418 0123



August 4, 2017

Via Federal Express
Rohit Khandekar.
1 2nd Street, Apartment 502
Jersey City, NJ 070302

Re: Recapture of Vested Restricted Stock Units

Dear Mr. Khandekar:

Please take notice that Virtu Americas LLC ("Virtu") demands, pursuant to Article 13, Paragraph 13.4 of the *KCG Holdings, Inc. Amended and Restated Equity Plan* and applicable award agreements, that you remit payment by August 11, 2014 to Virtu in the amount of $199,998.11 representing the cumulative value of the stock awards for which realization events occurred in 2015, 2016 and 2017.

Sincerely,

Matthew Levine
Deputy General Counsel

cc: Harry Lipman via email

| | |
|---|---|
| **From:** | Matthew Levine |
| **To:** | Zachary Rosenberg |
| **Cc:** | Harry Lipman; Dugan, William; Devaney, William; Kaplan, Jacob M.; Lewis, Robert P; Muir, Catherine; Hatchett, Juliet |
| **Subject:** | RE: Letter |
| **Date:** | Tuesday, August 08, 2017 2:13:39 PM |

Zack –

On or about July 20, 2017, KCG Holdings, Inc. merged with and into a subsidiary of Virtu Financial Inc. The surviving entity was reclassified into an LLC and renamed Virtu KCG Holdings LLC.  As a result of the merger, KCG Americas LLC's names was changed to Virtu Americas LLC. Section 2.9 of the Plan defines "Company" as KCG Holdings, Inc. and any of its subsidiaries, affiliates and any successor entity thereto.

Virtu intends to enforce its rights pursuant to Section 13.4 of the Plan because Mr. Khandekar violated his confidentiality and proprietary information obligations.  As stated in my August 4 letter, the amount is the aggregate value of the stock awards that vested between January 1, 2015 and January 1, 2017. By this Friday, August 11, 2017, Mr. Khandekar can provide a check made payable to Virtu Americas Inc. in the amount of $199,996.11. He should direct the payment to my attention. If Mr. Khandekar prefers, he can also satisfy the payment via wire transfer. If Mr. Khandekar refuses to make the payment by August 11, Virtu will pursue legal action to enforce its rights under the Plan.

This email is without prejudice to Virtu's rights, all of which are expressly reserved.

Thanks,

Matt

---

**From:** Zachary Rosenberg [mailto:zrosenberg@rlrpclaw.com]
**Sent:** Monday, August 07, 2017 3:07 PM
**To:** Matthew Levine <mlevine@virtu.com>
**Cc:** Harry Lipman <hlipman@rlrpclaw.com>; Dugan, William <William.Dugan@bakermckenzie.com>; Devaney, William <William.Devaney@bakermckenzie.com>; Kaplan, Jacob M. <Jacob.Kaplan@bakermckenzie.com>; Lewis, Robert P <Robert.Lewis@bakermckenzie.com>; Muir, Catherine <catherine.muir@bakermckenzie.com>; Hatchett, Juliet <Juliet.Hatchett@bakermckenzie.com>
**Subject:** Letter

Matt,

We received your letter dated August 4, 2017 to Mr. Khandekar demanding payment of $199,998.11.  Your letter does not state why Virtu believes it has any contractual rights with respect to Mr. Khandekar, why you believe Article 13.4 is applicable, how you calculated your demand amount, or how repayment is to be made.  Your letter also includes a request for payment by August 11, 2014, almost three years in the past.  If you wish to pursue any demand from Mr. Khandekar,

please clarify these matters.

This email is without prejudice to all of Mr. Khandekar's rights, all of which are expressly reserved.

Thanks,
Zack

_____

C. Zachary Rosenberg
Rottenberg Lipman Rich, P.C.
The Helmsley Building
230 Park Avenue, 18th Floor
New York, NY 10169
(212) 661-3080 (phone)
(646) 203-0298 (fax)
zrosenberg@rlrpclaw.com
www.rlrpclaw.com

**WE HAVE MOVED!**
**PLEASE NOTE OUR NEW NYC OFFICE ADDRESS**

**The Helmsley Building**

**230 Park Avenue, 18th Floor**
**New York, NY 10169**

Our phone, fax and email addresses remain unchanged.

*This message, together with its attachments, if any, may contain information that is legally privileged and/or confidential, and is intended only for the use of the individual or entity to which it is addressed. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or of its contents, or any attachments, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by return e-mail or by telephone (212-661-3080) and delete the message, along with any attachments thereto, from your computer. Thank you.*

This message, including any attachments, is intended only for the personal and confidential use of the designated recipient(s) to which it is addressed. This communication may contain information that constitutes attorney work product, is privileged, confidential or otherwise protected from disclosure. If the reader of this message is not the designated recipient, you are hereby notified that you have received this communication in error, and that any review, dissemination, retention, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone at +1 212 418 0113 or by e-mail reply to the sender, and discard any paper copies and delete all electronic files of this communication. Virtu Financial LLC.

ROTTENBERG LIPMAN RICH, P.C.

THE HELMSLEY BUILDING
230 PARK AVENUE
EIGHTEENTH FLOOR
NEW YORK, NEW YORK 10169
TELEPHONE (212) 661-3080
TELECOPIER (212) 867-1914

NEW JERSEY OFFICE
PARK 80 WEST, PLAZA ONE
250 PEHLE AVENUE, SUITE 101
SADDLE BROOK, NEW JERSEY 07663
TELEPHONE (201) 490-2022
TELECOPIER (201) 490-2040

WWW.RLRPCLAW.COM

HARRY W. LIPMAN
MEMBER
HLIPMAN@RLRPCLAW.COM

August 14, 2017

**VIA Email & First Class Mail**

Matthew Levine, Esq.
Deputy General Counsel
Virtu Financial
300 Vesey Street
New York, NY 10282

Re:   Demand by Virtu Americas LLC to Recapture
      Vested Restricted Stock Units

Dear Matt:

        We write in response to your letter dated August 4, 2017, in which you demand
on behalf of your client Virtu Americas LLC ("Virtu Americas") that our client, Rohit
Khandekar, pay Virtu Americas $199,996.11, pursuant to paragraph 13.4 of the KCG Holdings,
Inc. Amended and Restated Equity Incentive Plan (the "Plan"). On behalf of Mr. Khandekar, we
reject your demand, for a number of reasons.

        Most basically, we reject Virtu Americas' demand because Mr. Khandekar
engaged in no wrongful conduct whatsoever, much less the specific conduct that would trigger a
"recapture" event under paragraph 13.4 of the Plan. That paragraph provides for recapture of
awards only if (1) within 2 years of vesting of the restricted stock award an employee/participant
(2) is terminated for Cause, violates a non-compete agreement, violates any confidentiality
obligation to the Company, or engages in fraud against the Company. You have failed to
identify any such conduct, either in your August 4 letter or in your follow-up email responding to
our email requesting in particular that you identify why you believe that paragraph 13.4 is
applicable. Assuming that the basis of Virtu Americas' position is limited to the same
allegations now being litigated in the action KCG Holdings, Inc. v. Khandekar (the "Federal
Action"), we are confident that that action will show that Mr. Khandekar engaged in no improper
conduct whatsoever, much less conduct that would result in forfeiture under paragraph 13.4.

        Your correspondence also fails to explain how Virtu Americas has standing to
demand payment from Mr. Khandekar under the Plan. Public filings reflect that, in connection
with its merger with Virtu Financial Inc, KCG Holdings, Inc. changed its name and corporate
form and became Virtu KCG Holdings, LLC. For example, a Form 8-K filed with the S.E.C. on
July 24, 2017 states:

ROTTENBERG LIPMAN RICH, P.C.
August 14, 2017
Page 2

> On the Effective Date, in connection with the completion of the
> Merger, the Company was converted from a Delaware corporation
> having the name "KCG Holdings, Inc." into a Delaware limited
> liability company having the name "Virtu KCG Holdings LLC."

Virtu KCG Holdings LLC therefore appears to be the likely successor to KCG Holdings, Inc. and the most proper entity to assert any claims under the Plan.[1]

      Your August 8 email additionally fails meaningfully to address the question of standing in light of the Change of Control provisions of the Plan. You stated only that "As a result of the merger, KCG Americas LLC's names was [sic] changed to Virtu Americas LLC. Section 2.9 of the Plan defines 'Company' as KCG Holdings, Inc. and any of its subsidiaries, affiliates and any successor entity thereto." Remaining unexplained is the relationship between Virtu Americas and Virtu KCG Holdings, LLC, as well as the status of Awards under the Plan in light of the Change in Control.

      Another fatal defect in Virtu Americas' demand stems from its failure to allege that the Committee took the action required under the Plan to cause Mr. Khandekar to forfeit and repay the value of his restricted stock. Paragraph 3.1 of the Plan provides that, "Unless otherwise provided in an Agreement, the Committee reserves the authority, in its absolute discretion, . . . to determine whether . . . Awards may be . . . cancelled, forfeited or suspended." While we dispute that the Committee has "absolute discretion," we are not aware of any writing by which Mr. Khandekar agreed that the Committee's authority to cancel, forfeit or suspend his Awards could be assigned or delegated. Further, despite Mr. Khandekar's demand in the Federal Action for all documents relating to plaintiffs' evaluation of his conduct, we are aware of no documents that plaintiffs produced in the Federal Action reflecting that the Committee duly evaluated Mr. Khandekar's conduct and decided that Mr. Khandekar should forfeit the value of his restricted stock awards. KCG's website reflects that the current members of the Committee are Rene M. Kern, James T. Milde and John C. Morris. Please immediately produce all documents – or direct us to any previously produced documents – reflecting that these three Committee members duly evaluated Mr. Khandekar's conduct and decided that he must forfeit the value of his restricted stock awards pursuant to the Plan.

      If, despite the foregoing, Virtu Americas (or some other entity) still intends to initiate legal action against Mr. Khandekar pursuant to the Plan, we note that paragraph 14.14 of the Plan requires arbitration. While Mr. Khandekar would consider stipulating to the inclusion of a claim under the Plan in the Federal Action, he also reserves his right to seek dismissal and/or a stay of either the Federal Action or the arbitration, should your clients decide to go that route.

---

[1] We note that despite the fact that the entity apparently no longer exists as a going concern, KCG Holdings, Inc. continues to be a named plaintiff in the pending litigation between KCG and Mr. Khandekar.

ROTTENBERG LIPMAN RICH, P.C.
August 14, 2017
Page 3

      This letter is without prejudice to Mr. Khandekar's rights and defenses, all of which are expressly reserved.

                         Very truly yours,

                         Harry W. Lipman

cc:    William Dugan, Esq.
       Jacob Kaplan, Esq.

HWL: mwa

3171