EXHIBIT G

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      --------------------------------------X
4      KCG HOLDINGS, INC., and
       KCG AMERICAS LLC,
5
                    Plaintiffs,
6
                vs.              17-cv-03533(AJN)
7
       ROHIT KHANDEKAR,
8
                    Defendant.
9
       --------------------------------------X
10
11
12         DEPOSITION OF KCG HOLDINGS, INC.,
13             and KCG AMERICAS LLC
14              BY PHILIP CHUNG
15             New York, New York
16          Wednesday, October 4, 2017
17
18
19
20
21
22
23
24     Reported by:
       JOAN WARNOCK
25     JOB NO. 131280

1                      P. Chung

2    declaration, other than what you've just

3    testified about?

4         A.    I believe that's it.

5         Q.    With regard to the predictors,

6    Mr. Chung, how did you conclude that

7    Mr. Khandekar accessed them?

8         A.    In a part of a different

9    investigation being conducted by Roy Vaccaro,

10   we or he was investigating or looking at some

11   false positives or, you know, hits that had

12   come up on his searches, and he noticed some

13   passing files, predictors potentially, in

14   Mr. Khandekar's personal directories.

15        Q.    Did he notice them in

16   Mr. Khandekar's personal directories or in

17   backups or copies of Mr. Khandekar's

18   directories?

19        A.    It would have been copies.

20        Q.    And where were those copies that

21   Mr. Vaccaro looked at?

22        A.    They were part of a separate

23   investigation, and so they were evidence in a

24   separate investigation.

25        Q.    And tell me how that discovery led

1                    P. Chung

2    to KCG's conclusion that Mr. Khandekar had

3    accessed these predictors?

4         A.   Once that was noticed, those files

5    were noticed in the copy, Mr. Vaccaro went

6    and looked in the actual -- in the original

7    place on our servers, and he found that those

8    files had been -- that they weren't there.

9    Then subsequently he went through historical

10   snapshots, and he found files from I believe

11   what is February 19th.

12        Q.   Found them where?

13        A.   In the snapshots.

14        Q.   Snapshots of what?

15        A.   Of the original -- of the original

16   user work space of Mr. Khandekar.

17        Q.   Is the list of predictors and other

18   files on Chung Exhibit 5 the predictors that

19   Mr. Vaccaro identified as having been on the

20   personal directory of Mr. Khandekar in

21   February of 2017?

22        A.   Yes.

23        Q.   How is it that KCG concluded that

24   Mr. Khandekar had misused these predictors?

25             MR. DUGAN:   Objection to the extent

1          P. Chung

2      MR. DUGAN:  Again, counsel, please

3  refrain.  They were legitimate

4  objections.  Let's refrain.  And if you

5  want to please read the question back

6  again so the witness can answer.

7      MR. LIPMAN:  And I will add,

8  however, that talking objections are not

9  appropriate in this district.

10  Q.  Go ahead, Mr. Chung.

11      MR. DUGAN:  It's not a talking

12  objection.  I disagree with counsel.

13  That is not a talking objection.  We've

14  both made out notes for the record.

15  Let's actually get on with the

16  deposition.

17      Can you read the question back,

18  please.

19      (The following record was read:)

20      "QUESTION:  I'm not quite sure

21  you've answered my question, which is,

22  as you sit here today, leaving aside

23  what might happen in the future, is KCG

24  aware of any way in which Mr. Khandekar

25  misused the predictors or the contents

1                    P. Chung

2        thereof other than by accessing the

3        predictors?"

4        A.    At this point what we know is that

5   he improperly accessed the predictors.

6        Q.    Does KCG know anything else other

7   than that with regard to Mr. Khandekar's

8   alleged improper use of these predictors?

9             MR. DUGAN:   Objection to the extent

10       it calls for a legal conclusion and

11       form.

12       A.    To this point we don't have any

13  evidence of -- we don't have any further

14  evidence that would say more than just

15  improperly accessing them.

16       Q.    During the period 2012 through

17  March of 2017, did KCG take any measures to

18  protect its trade secrets and confidential

19  information?

20       A.    Yes.

21       Q.    What steps did KCG take to protect

22  its trade secret and confidential

23  information?

24       A.    We encrypt files.  We encrypt,

25  meaning the predictors.

1                    P. Chung

2        Q.    Okay.

3        A.    We have access control around the

4   source code in general.

5        Q.    What do you mean by that?

6        A.    Meaning you need to have a password

7   and you need to have permissions to look at

8   certain projects.

9        Q.    Does projects include predictors?

10       A.    Yes.   They -- predictors would be

11  part of that, yeah.

12       Q.    Okay.   So that's what you meant by

13  access control around source code?

14       A.    Yes.

15       Q.    What else?   What other steps has

16  KCG taken?

17       A.    We've had training around

18  confidentiality, IP.

19       Q.    Training that Mr. Khandekar had?

20       A.    I believe so.

21       Q.    And training that other quants at

22  KCG had?

23       A.    Certainly -- certainly if they had

24  started in 2012, yes.

25       Q.    What else?   What other steps did

Page 42

1                    P. Chung

2      KCG take during that period to protect its

3      trade secret and confidential information?

4          A.    People also protect different areas

5      of storage, their files to keep sensitive

6      material there, certainly like research

7      material.

8          Q.    You're talking about on the

9      electronic --

10         A.    Yeah.

11         Q.    -- computer system?

12         A.    Yes.

13         Q.    Anything else?

14         A.    We also -- there's definitely

15     training from compliance in order to keep

16     different parts of the businesses separate,

17     meaning customer, client, you know, to

18     protect client information.

19         Q.    With regard to the predictors you

20     may have partially answered this already, but

21     did KCG use access restrictions and

22     permissions with regard to the files?

23         A.    Yes.

24         Q.    And -- sorry.  Go ahead.

25         A.    In addition to encryption.

1                    P. Chung

2        Q.   Right.  And did KCG's training of

3   quants include issuing to quants

4   documentation with regard to encrypting files

5   and creating password or other kinds of

6   permissions for those documents?

7        A.   There are -- yes, there are various

8   wiki pages, loop pages.

9        Q.   Wiki pages and loop pages; is that

10  right?

11       A.   Yes.  For the record, the loop is the

12  name we use for Confluence, for our

13  Confluence instances.  I don't know if that

14  actually helps.

15       Q.   Would you describe KCG's use of

16  encryption and access permissions with regard

17  to predictor files to be important to KCG's

18  efforts to protect its trade secret

19  information?

20       A.   Yes.

21       Q.   I think you testified earlier that

22  you're aware that Mr. Khandekar gave notice

23  in mid-March 2017; right?

24       A.   Yes.

25       Q.   Do you know when Mr. Khandekar's

1                       P. Chung

2    your attention, this email chain?

3        A.    I don't recall.  I just know that I

4    know the information from it.

5        Q.    The first email in the chain is

6    from Mr. Khandekar to Mr. Liu.  Do you see

7    it?

8        A.    Yes.

9        Q.    And in Mr. Khandekar's email to

10   Steve Liu on March 15, he says, "I found only

11   two emails that have information related to

12   my work here, and I have attached them, I

13   have attached those emails here."

14            Have you confirmed that that's

15   accurate?

16       A.    Which part?

17       Q.    That Mr. Khandekar found only two

18   emails related to his work here?

19       A.    I've seen the two, I've seen the

20   two emails as evidence.

21       Q.    Have you confirmed that those two

22   emails are the only two emails that

23   Mr. Khandekar sent related to his work at

24   KCG?

25       A.    I have personally not confirmed.

1                     P. Chung

2   And, again, I don't want to speculate about

3   something I don't know throughout the email

4   investigation.  I'm sure we can find out if

5   we have to.

6        Q.   Mr. Khandekar then writes, "All

7   other emails I had sent to outside domains

8   contain only personal information and do not

9   contain any KCG confidential information."

10             Has KCG confirmed the accuracy of

11  that statement?

12       A.   Again, I can't -- I don't want to

13  speculate.

14       Q.   You don't know?

15       A.   I don't know personally.

16       Q.   Would you agree that quants at KCG

17  develop confidential information?

18       A.   Yes.

19       Q.   Would you agree that quants at KCG

20  learn that confidential information that they

21  develop?

22       A.   There is some learning.  There is

23  also some research and producing.

24       Q.   And there's also forgetting; right?

25             MR. DUGAN:  Objection.  Foundation.

                        P. Chung

1

2       A.   I can't -- yeah, I can't get into

3   the mind of a quant.

4       Q.   Well, would you be willing to agree

5   that the confidential information that a

6   quant learns can be forgotten over time?

7            MR. DUGAN:  Objection to form and

8        foundation.

9       A.   It depends on the individual.

10      Q.   If and when a quant were to leave

11  KCG, would it be fair to say that that quant

12  was necessarily going to leave KCG with

13  confidential information in his or her head?

14           MR. DUGAN:  Objection to form,

15       foundation, and outside the scope of the

16       30(b)(6).  Harry, if you could just

17       point to the 30(b)(6), we'll go through

18       the same process, which topic this

19       question --

20           MR. LIPMAN:  I want the witness to

21       answer the question.

22           MR. DUGAN:  Okay.  Just for the

23       record, counsel is refusing to answer

24       which topic this question goes to the in

25       the 30(b)(6) notice.  For the record, it

1              P. Chung

2         MR. LIPMAN:  Okay, Bill?

3         MR. DUGAN:  Yeah.

4         Q.   Prior to April 2017, was it KCG's

5    policy to require quants to restrict their

6    directories?

7         A.   Yes.

8         Q.   And where is that policy stated?

9         A.   They certainly are -- there are

10   various places on loop pages, on wiki pages,

11   and certainly it would have been part of

12   training for new quants.

13        Q.   Can you tell me with regard to a

14   file that a quant creates in UNIX every way

15   in which that file can be protected from

16   someone else looking at it on the system?

17        A.   UNIX permissions, encrypting, UNIX

18   permissions on the directory it is in.

19        Q.   Anything else?

20        A.   No access to the storage at all for

21   that particular user.

22        Q.   Anything else?

23        A.   You could obfuscate it, trying to

24   make it hard to find.

25        Q.   How would one do that?

Page 78

```
 1                  P. Chung
 2          Is there any policy specifically
 3   with regard to writing scripts that you're
 4   aware of?
 5              MR. DUGAN:  Objection.  Asked and
 6       answered.
 7       Q.   Prohibiting the use of scripts?
 8       A.   Not a specific one for scripts.
 9       Q.   Would it be fair to characterize
10   the use of a script under certain
11   circumstances to be a way for a user to
12   automate a series of what otherwise would
13   have to be manual steps?
14              MR. DUGAN:  Objection to form and
15       foundation.
16       A.   Yes.  That is what a script could
17   certainly be used for.
18       Q.   And if those manual steps didn't
19   violate any rule or policy at KCG, then the
20   use of a script to run those manual steps
21   similarly wouldn't violate any rule or policy
22   at KCG.
23              MR. DUGAN:  Objection to form.
24       Q.   Agreed?
25              MR. DUGAN:  Same objection.
```

1                    P. Chung

2       A.   If the only thing that the script

3   did were the exact commands that you're

4   referring to, sure, agree.

5       Q.   Did KCG ever have any policy that

6   prohibited a system user from listing the

7   contents of the directory to which he or she

8   had access?

9       A.   Our policies state that we -- that

10   if you are not supposed to have access to a

11   directory, you're not supposed to access it

12   regardless of whether you have UNIX

13   permissions.

14       Q.   That's a written policy or just a

15   convention?

16       A.   It's an interpretation of the

17   policies that we have.  I mean we have

18   confidential information, and, you know, only

19   certain people have access to that.  It's

20   immaterial whether you can physically access

21   it.

22       Q.   And where is that policy written

23   that you shouldn't access directories that

24   you have access permissions to access?

25            MR. DUGAN:  Object to the form.

1              P. Chung

2       Q.    And in order to gain access to

3  KCG's computer system to run these scripts

4  and access the ███ predictor files,

5  Mr. Khandekar had to use his KCG password to

6  get onto the system; right?

7       A.    Correct.

8       Q.    Let's take a look at Exhibit 13.

9  Well, it won't be marked as 13.  It's my 13?

10            MR. LIPMAN:  Let's mark this as 8,

11       please.

12            (Defendant's Chung Exhibit 8,

13       Knight Capital Group, Inc., Employee

14       Handbook, Bates stamped KCG 010691

15       through 010782, marked for

16       identification, as of this date.)

17       Q.    And I will represent to you that up

18  until about 10:30 or so last night, this was

19  the only employee handbook that we had been

20  produced in this case.  We're copying the

21  other one right now.  But do you recognize

22  this document, Mr. Chung?  And you could

23  actually sit here and read the entire

24  document if you wanted to, but --

25            MR. DUGAN:  He's not going to read

1                    P. Chung

2    document?

3         A.   If you can access it.  You have to

4    ask for explicit access to various projects

5    and directories.

6         Q.   Does KCG believe that Mr. Khandekar

7    used any kind of decrypting devices or code

8    breaking devices to access or view any of the

9    predictors at issue?

10        A.   Not to my knowledge.

11        Q.   Were any of the files that

12   Mr. Khandekar accessed, those files being set

13   forth on Chung Exhibit 5, encrypted?

14        A.   To the best of my knowledge, no.

15        Q.   Were any of them password protected

16   or otherwise restricted from his accessing

17   and viewing them?

18        A.   From a technical standpoint --

19        Q.   From a UNIX permission standpoint.

20        A.   Yeah, UNIX -- technical UNIX

21   standpoint, by definition, because he was

22   able to copy them, he had UNIX permission for

23   them.

24        Q.   The files that Mr. Khandekar

25   accessed all had PGP permissions that allowed

1                    P. Chung

2    know now of his activities, we believe that

3    he -- that his intent was to use those

4    simulation results for his own personal

5    benefit.

6         Q.    What evidence do you have of that?

7         A.    We know that he emailed those

8    results to himself.

9         Q.    Anything other than that?

10        A.    And we know that -- and after the

11   fact we discovered that he was

12   inappropriately accessing files that he

13   should not have, and we also know that in the

14   context of -- we know that he during that

15   time period was applying for employment at

16   our major competitor, Two Sigma.

17        Q.    Anything else?

18        A.    And we also discovered that he

19   misrepresented himself on his resume to

20   Two Sigma where he claimed he had worked on

21   alphas, predictors based on ████████████

22   ███████, which we know to be not true.

23        Q.    How does the fact that, in your

24   words, he misrepresented himself on his

25   resume support the inference that he used the

Page 122

1                    P. Chung

2   two emails for personal purposes?

3        A.    Again, given the context of knowing

4   what Mr. Khandekar had done after the

5   investigation, that led us to believe that.

6        Q.    What evidence does KCG have that

7   Mr. Khandekar accessed the predictors at

8   issue for his personal purposes contrary to

9   KCG's interests?

10       A.    Applying for a job that was a step

11  up in his current role at our major

12  competitor and misrepresenting the extent of

13  his experience leads us to believe -- leads

14  us to believe that he was doing inappropriate

15  things with our intellectual property.

16       Q.    Can you be more specific as to what

17  evidence KCG has that Mr. Khandekar was using

18  the predictors that he accessed that are at

19  issue for his personal purposes contrary to

20  KCG's interests?

21       A.    He got a job offer by

22  misrepresenting himself saying that he knew

23  -- he had knowledge about a certain type of

24  predictor, which he did not.  It's pretty

25  plain.  That's personal benefit.

1                    P. Chung
2         Q.   What predictor did Mr. Khandekar
3    claim to have knowledge of?
4         A.   He claimed to have knowledge of
5    ██████████████████.
6         Q.   And how does Mr. Khandekar's
7    reference to ████████████████   in his
8    resume relate to his improper access of
9    predictors at issue in this case, in KCG's
10   view?
11        A.   Predictors that he was authorized
12   to work on at KCG were not ████████████
13   ████████████ predictors.   The only person
14   doing -- at the time doing ███████████████
15   ██████████ type predictors was ████,
16   which Mr. Khandekar improperly accessed
17   predictors written by and owned by ████.
18        Q.   Looking at KCG-5, which predictors
19   are you specifically referring to?   Which
20   predictor or predictors are you specifically
21   referring to?   If you can specify the KCG
22   page and the predictor name.
23        A.   To the best of my knowledge, most
24   of the files, majority of the files that
25   ██████████ was the additional PGP recipient

1                      P. Chung

2    list on.  So on the exhibit that will be

3    KCG 010635, that should be the last three on

4    Page 2 and about half the page of Page 3.

5         Q.   So am I correct to assume that what

6    you're saying is that Mr. Khandekar accessed

7    certain predictors that ████████████ was

8    working on in order to or as part of a plan

9    to misrepresent himself on his resume to

10   Two Sigma?

11        A.   That's what it seems, yes.

12        Q.   Okay.

13        A.   Certainly to enhance his -- enhance

14   his resume and enhance his prospects for

15   whatever compensation that he could have

16   gotten.

17        Q.   And how did that harm or injure KCG

18   if he did do that?

19        A.   If those types of predictors had

20   gotten into production at Two Sigma, that

21   would directly affect the profitability of

22   KCG.

23        Q.   I'm not asking that.  I'm asking

24   how did it harm KCG, not how it could

25   theoretically harm KCG, but how, if at all --

1                      P. Chung

2    about the confidentiality of client

3    information, for instance.

4              MR. LIPMAN:  Let me hand you what

5         will be marked as Exhibit 12.

6              (Defendant's Chung Exhibit 12,

7         Document titled Policy Title: Access

8         Control Policy, Bates stamped KCG 000270

9         through 275, marked for identification,

10        as of this date.)

11        Q.   Before you start looking at the

12   document, though, let me ask you a question.

13   Does KCG believe that it's fundamental to

14   information security for users to determine

15   who is entitled to access their information?

16             MR. DUGAN:  Objection to form.

17        A.   It's certainly part of your job.

18        Q.   As a quant?

19        A.   Not just a quant.

20        Q.   But including quants?

21        A.   Yes.

22        Q.   Are file access permissions to be

23   established under KCG policy by the owners of

24   the information?

25        A.   The owner of the file.

1                    P. Chung

2    implementation of controls and continuous

3    oversight to restrict access?

4         A.    Yes.

5         Q.    And would you agree that with

6    regard to both statements, that quants were

7    expected to read and understand and follow

8    those policies?

9         A.    Yes.

10        Q.    So turning to 3.2.3 under

11   "Authorization," (a) states, "The permissions

12   to read, write, modify, update, or delete

13   information from files or databases should be

14   established by the owners of the

15   information."  Right?

16        A.    Um-hmm.  Yes.

17        Q.    This says that the owner of a file

18   in question is required to set appropriate

19   permissions; correct?

20        A.    Well, 3.2.3(a) says the permissions

21   should be established by the owners.

22        Q.    Okay.  Is there a difference

23   between established and set --

24        A.    Yes.

25        Q.    -- in your mind?

Page 183

1                    P. Chung

2    know, act in that way.

3         Q.    Are you aware of any system called

4    the reminder system or the like?

5         A.    Reminder?

6         Q.    A system that Mr. Liu, actually,

7    Steve Liu testified about which was in place

8    at KCG, according to Mr. Liu, which searched

9    for unprotected confidential information on

10   KCG's systems and somehow notified the owner

11   of that information to protect it.  Does that

12   ring any bells?

13        A.    Yes.

14        Q.    What's that?  What's that called?

15        A.    It didn't have a name.

16        Q.    When was it implemented?

17        A.    The best of my knowledge, my

18   previous manager asked at the time the head

19   of infrastructure for our group to write a

20   script to accomplish what you just described.

21        Q.    Who was your previous manager?

22        A.    Pang Chau.

23        Q.    P-a-n-g, C-h-o-u?

24        A.    A-u.

25        Q.    When was that?

Page 184

P. Chung

1

2      A.    I'm not sure exactly.   It had to be

3    before February 2011.

4      Q.    Why is that?

5      A.    That is when Pang Chau left the

6    firm.

7      Q.    Where did Pang Chau go?

8      A.    Eventually he went to Citadel, a

9    competitor.

10     Q.    Is that where he is now?

11     A.    No.

12     Q.    Do you know where he is now?

13     A.    I do not.

14     Q.    Do you have his contact

15   information?

16     A.    I have older contact information.

17   We haven't been in touch for a while now.

18     Q.    So sometime before February 2011

19   Pang Chau asked someone in the infrastructure

20   department to create a script to implement

21   this reminder system?

22     A.    Yes.

23     Q.    Who was the person who carried out

24   Mr. Chau's instructions?

25     A.    Jinsong.

1             P. Chung

2        Q.    How do you spell that?

3        A.    J-i-n-s-o-n-g, and then Wang,

4   W-a-n-g.

5        Q.    Is that one person?

6        A.    Yes.

7        Q.    And did -- Mr. Wang?

8        A.    Yeah.

9        Q.    Okay.  Did Mr. Wang create the

10   script that Mr. Chau asked him to create?

11        A.    That is my understanding, yes.

12        Q.    And was that reminder system put in

13   place?

14        A.    That is my understanding, yes.

15        Q.    What is your understanding based

16   on?

17        A.    Discussions with Jinsong.  At some

18   point I started to manage him also.

19        Q.    Did you manage the reminder system?

20        A.    No.

21        Q.    Who was in charge of managing the

22   reminder system?

23        A.    I mean ultimately that was at the

24   request of Pang.

25        Q.    Was Pang monitoring the reminder

Page 186

1                    P. Chung

2    system?

3         A.    Define monitoring.

4         Q.    Well, who was overseeing how the

5    reminder system was working after it was put

6    in place?

7         A.    Yeah.  Ultimately Pang.

8         Q.    Who else?

9         A.    Well, Jinsong since he wrote the

10   code.

11        Q.    And Jinsong, is he still at KCG?

12        A.    No, he's not.

13        Q.    Where is he?

14        A.    I don't know.

15        Q.    Was the reminder system effective?

16              MR. DUGAN:   Objection to form.

17        Q.    Well, let me ask it this way.

18        A.    It helped.

19        Q.    What did it help with?

20        A.    It pointed out to people that had

21   accidentally left their sensitive files with

22   too loose of access permissions.

23        Q.    With what?

24        A.    Too loose of access permissions, or

25   too permissive of permissions.

Page 187

1                    P. Chung

2        Q.   Is the reminder system still in

3   place today?

4        A.   No.

5        Q.   Why not?

6        A.   When Jinsong left, it ran under his

7   account, and from the technology side, we

8   didn't notice for a while.  And by the time

9   we noticed, we didn't have access to the

10  code.

11       Q.   When did Jinsong Wang leave?

12       A.   I have to confirm, but I believe

13  mid-2013.

14       Q.   When did you find out that the

15  reminder system had stopped working?

16       A.   I can't recall exactly.

17       Q.   Well, how long was it after --

18       A.   But certainly quite a while.

19       Q.   How long was it after Mr. Wang

20  left, which was in mid-2013, did you realize

21  that the reminder system was no longer

22  working?

23       A.   I think we didn't notice until --

24  or it didn't come up probably until like

25  three years later.

1            P. Chung

2        Q.    So sometime in 2016?

3        A.    Yeah.   Three or four years later.

4    I don't recall exactly when.

5        Q.    Well, was it in the past six

6    months?

7        A.    Past year.

8        Q.    Was there any documentation --

9        A.    No.

10       Q.    -- describing the plan or the

11   permission?

12       A.    No, there wasn't.

13       Q.    I'm sorry.   The reminder system?

14       A.    There was not.

15       Q.    Were there any communications

16   regarding it that you're aware of?

17       A.    Other than the reminder emails that

18   went out, I'm not aware of any

19   communications.

20       Q.    How many emails were sent out under

21   the system while it was in place?

22       A.    I don't know.

23       Q.    Fewer than ten?

24       A.    I don't know.   I would assume more

25   than ten.

Page 198

1          P. Chung

2    on the BS storage.

3         Q.   Was it KCG's policy to protect

4    files intended to be secret by either using

5    encryption or access permissions?

6              MR. DUGAN:  Objection to form.

7         A.   It is explicitly KCG's policy to

8    secure access to the predictors through

9    encryption and through permissions.

10        Q.   As well as other files that were

11   intended to be secret?

12             MR. DUGAN:  Objection to foundation

13        and form.

14        A.   Such as?

15        Q.   Unencrypted code.

16        A.   Are you speaking of unencrypted

17   versions of the encrypted code?

18        Q.   Yes.

19        A.   And what are you asking

20   specifically about it?

21        Q.   Was it KCG's policy to protect such

22   files by using either --

23        A.   Yes.

24        Q.   -- encryption or access

25   permissions?

1                    P. Chung

2    interacting with secret code on how to -- how

3    to work with it productively.

4        Q.    Does it warn at several places

5    regarding making Linux environment secure, or

6    does it I guess encourage quants in several

7    places in the document to make their Linux

8    environment secure?

9            MR. DUGAN:   Objection to form.

10       A.    Yeah.  Like, for instance point

11   one, make sure that your Linux environment is

12   secure.

13       Q.    And one way of doing that is to add

14   umask 0077; right?

15       A.    Yes.

16       Q.    Or alternatively, chmod, that

17   protocol would also help secure a file?

18       A.    Correct.

19       Q.    And these are instructions to

20   quants as to how to secure such files; right?

21       A.    Yes.

22       Q.    And it says by adding umask 0077 to

23   the end of your two different path names

24   there, this ensures that by default all new

25   directories and files created do not have any

1                    P. Chung

2     group or other access permissions.

3              Does this indicate that if a quant

4     added these codes or instructions to the Bash

5     rc or dot profile areas, that others couldn't

6     access them?

7          A.   What it ensures is if you set your

8     umask to 0077 in the Linux shell that you're

9     working in, or Bash shell that you're working

10    in, when you create a new directory or a new

11    file, the default permissions that are

12    created on it will be only for the user to

13    access.

14         Q.   And these were instructions that

15    quants were expected to follow; right?

16         A.   Yes.

17         Q.   Would it be fair to say that in

18    requiring quants to use the umask 0077

19    function, KCG was trying to safeguard against

20    quants unwittingly giving access permissions

21    when none were intended?

22         A.   That's true.

23         Q.   What's the warning in the middle of

24    the page preceded by a pound sign?

25         A.   It's a warning about not running

1                    P. Chung

2     server while encrypting that file?

3          A.    The question is a bit misworded.

4          Q.    Well, I'm specifically referring to

5     using the command SVN-secret encrypt.

6          A.    Okay.  So yes, it uses that script,

7     uses the additional PGP recipients list

8     that's in that file.

9          Q.    And it uses the public keys of the

10    users listed on the PGP --

11         A.    Yes.

12         Q.    -- line?

13         A.    Yes.

14         Q.    The PGP list is used by the file

15    for that purpose; correct?

16         A.    Is used by the file?

17         Q.    Well, sorry.  That doesn't make a

18    lot of sense to you and probably no one else

19    of your caliber.  But the PGP list is used

20    only for that purpose in the UNIX world?

21              MR. DUGAN:  Objection to form.

22         A.    Umm, I would also argue if someone

23    looked at it with their eyes, it would tell

24    them who had access to it.

25         Q.    Does the secret server use the PGP

1                    P. Chung

2    list in any way other than the one mentioned

3    other than to execute the SVN command?

4         A.   For anything else?  It's used just

5    in the context of encrypting the file before

6    checking it into source control, SVN.

7         Q.   Would the owner of an unencrypted

8    file in the UNIX system be able to modify the

9    PGP list?

10        A.   The owner of?

11        Q.   An unencrypted file.  So a file

12   that had been encrypted and is now

13   unencrypted.

14        A.   Right.

15        Q.   And you can access it.  Can you

16   modify the PGP list?

17        A.   If they have write access to it.

18        Q.   So if there were no access

19   restrictions with regard to a particular user

20   who has access to an unencrypted file, that

21   user could modify the PGP list?

22        A.   If they have write access to the

23   file, meaning w-r-i-t-e, then they could

24   modify the list.

25        Q.   The PGP list itself is not

Page 229

1            P. Chung

2            (The following record was read:)

3            "QUESTION:  Is there any specific

4       instruction, written instruction that

5       you're aware of that KCG has ever

6       published other than the one we just

7       looked at from May 2017 that

8       specifically directs quants not to look

9       into other quants' directories?"

10      A.    You could argue our policy on

11   accessing information that you're only

12   supposed to access covers that.

13      Q.    Anything else besides that?

14      A.    No.

15      Q.    Prior to April 2017, were there any

16   written guidelines in existence at KCG

17   telling employees what to do after resigning

18   to transition their workspace to another

19   quant or other quants?

20            MR. DUGAN:  Objection to form.

21      A.    There are written policies in the

22   documents we've looked at previously.  The

23   process that I've seen is that HR speaks to

24   the manager, and they discuss what makes

25   sense.

1                    P. Chung

2          Q.    Any others?

3          A.    To the best of my knowledge, no,

4     I'm not aware.

5          Q.    Were Bash history files stored on

6     personal directories at KCG?

7                MR. DUGAN:   Again, objection.   It's

8          outside the scope of the 30(b)(6).   And

9          to the extent the witness can answer it,

10         he'll answer it based upon his personal

11         knowledge, not as a 30(b)(6).

12         A.    Yeah, by default, the Bash

13    histories exist in their home directory, in

14    your home directory.

15         Q.    Would it be a violation of KCG's

16    document retention policy to delete Bash

17    history files?

18         A.    I'm not a hundred percent sure.

19         Q.    In your experience of working with

20    quants, don't they create and delete files on

21    a regular basis just to do their work?

22         A.    Sure.   In the course of their daily

23    work, sure.

24         Q.    Is it your position that every time

25    they delete a file, it's a violation of KCG's

1                    P. Chung

2    document retention policy?

3            MR. DUGAN:  Objection to form and

4        foundation.

5        A.   It is not.

6        Q.   Why not?

7        A.   If you create a dummy file and then

8    you delete it, that's not a -- you're not

9    required to retain that document, that file.

10   If you build code, you're not required to

11   keep the object and the executables around,

12   the intermediate files.  There are lots of

13   temporary files that get created when you do

14   things.  You're not required to retain those

15   documents.

16       Q.   Where are these exceptions to the

17   document retention policy found?

18           MR. DUGAN:  Objection to form.

19       Q.   Are they in writing, or are you

20   just from experience testifying as to how you

21   understand the policy to be followed?

22           MR. DUGAN:  Objection to form.

23       A.   I would have to review explicitly

24   the policy.  But how I am describing it right

25   now, that's certainly experience.

1                    P. Chung

2        Q.    Based on your experience?

3        A.    Yeah.  The examples I gave.

4        Q.    Did KCG have any explicit policy at

5  any time that instructed quants not to wipe

6  their company laptop before turning it over

7  after they've resigned?

8        A.    There's a policy either in the

9  portable work device policy -- I'm sorry if

10  I'm mangling the title, but there is a policy

11  out there that restricts employees from

12  altering the operating system on a KCG-issued

13  device.

14        Q.    Is there any specific policy that

15  forbids quants from wiping data, not

16  interfering with the operating system, but

17  wiping the data off of a laptop before

18  turning it in?

19        A.    Specific to that policy, and

20  specific to Mr. Khandekar's Mac laptop, he

21  wiped it clean and replaced the operating

22  system.  With respect to just deleting

23  certain files, other than specific personal

24  files that are not of a work nature, I would

25  interpret our policies on folks exiting the

Page 236

1              P. Chung

2        MR. LIPMAN:  Let's mark the

3     transcript for a possible document

4     request there.

5        MR. DUGAN:  You have it, Harry.

6     Q.    There is an allegation in this case

7  that Mr. Khandekar reviewed or copied the

8  predictors at issue, the ██ predictors for

9  reasons unrelated to KCG's business purposes.

10 Are you aware of that allegation?

11     A.    Yes, I am.

12     Q.    How did KCG determine that

13 Mr. Khandekar looked at the predictors at

14 issue for reasons unrelated to KCG business?

15     A.    We have a Bash history.  We have

16 the snapshot of the files.  And we also know

17 the timing of all of this and all of his

18 activity.  And it was during his reaching out

19 to Two Sigma to look for employment.

20     Q.    Did KCG conduct any kind of study

21 of the work that Mr. Khandekar had been doing

22 at KCG to reach that conclusion that he

23 looked at the predictors for reasons

24 unrelated to KCG's business purposes?

25     A.    Study?

Page 237

```
 1                    P. Chung
 2        Q.    Analysis?
 3        A.    If by analysis meaning he looked at
 4   specific predictors that he didn't have
 5   access to and then advertised in his resume
 6   that he knew and had produced himself
 7   predictors that used ███████████████, if
 8   you want to call that analysis, then sure.
 9        Q.    Anything else?
10        A.    No.
11        Q.    So you're not aware of any
12   analysis, investigation, or effort by KCG to
13   determine if any of the predictors that
14   Mr. Khandekar looked at actually related to
15   his ongoing work at KCG?
16             MR. DUGAN:  Objection to form.
17        A.    We know the list of predictors he
18   had explicit access to, because it's listed,
19   and I believe that's been put in evidence.
20   All the other files that he looked at he did
21   not have explicit permission to access.  So
22   it's pretty simple analysis-wise.
23        Q.    Can you answer my question, please?
24   Because that wasn't an answer to my question.
25   Do you want it read back?
```

```
1                    P. Chung
2          MR. DUGAN:  Don't worry about the
3     comments.  Listen to the question and
4     provide your answer.  His commentary is
5     irrelevant.
6          You can ask another question, or if
7     you want that one read back, he can
8     answer it again if you'd like.
9          MR. LIPMAN:  Read it back, please.
10    And I would ask the witness to answer
11    the question.
12         MR. DUGAN:  He did.
13         MR. LIPMAN:  He did not.
14         MR. DUGAN:  Well, again, we
15    disagree.
16         MR. LIPMAN:  You know he didn't.
17         (The following record was read:)
18         "QUESTION:  So you're not aware of
19    any analysis, investigation, or effort
20    by KCG to determine if any of the
21    predictors that Mr. Khandekar looked at
22    actually related to his ongoing work at
23    KCG?"
24    A.   I just described the analysis in my
25    previous answer.
```

Page 239

1              P. Chung

2      Q.    The analysis having to do with the

3  predictors that he looked at --

4      A.    Yeah, whether he had access --

5      Q.    -- that he put on the resume?

6      A.    -- to them or not.

7          MR. DUGAN:  Sorry.  Nothing for me.

8      Go ahead if there's a question.  I'm not

9      sure if there's a question.

10     A.    The analysis of looking at what

11 Mr. Khandekar had access to in terms of the

12 PGP recipient list, and then the files that

13 he accessed, improperly accessed where he

14 didn't have explicit access to on the

15 recipient list.

16     Q.    Okay.  So would it be fair to

17 conclude that KCG has determined that

18 Mr. Khandekar looked at the predictors for no

19 legitimate business purpose because he

20 shouldn't have looked at the predictors?  Is

21 that another way of putting it?

22          MR. DUGAN:  Objection to form.

23     Argumentative.

24     A.    He was -- he did not have

25 permission to look at those files.

1                       P. Chung

2        Q.    Can you answer my question as to

3    whether or not I understand what you're

4    saying.  Do you want to have it read back?

5              MR. DUGAN:  Objection.

6        Argumentative.

7        A.    Sure.

8              MR. LIPMAN:  Okay.  Let's read it

9        back.

10             (The following record was read:)

11             "QUESTION:  So would it be fair to

12        conclude that KCG has determined that

13        Mr. Khandekar looked at the predictors

14        for no legitimate business purpose

15        because he shouldn't have looked at the

16        predictors?  Is that another way of

17        putting it?"

18       A.    Yes, he had no legitimate reason,

19   no legitimate business reason to be looking

20   at those predictors where he did not have

21   access to, explicit access to.

22       Q.    Would it follow from that statement

23   that KCG would consider Mr. Khandekar's

24   accessing the predictors to be wrongful even

25   if he looked at them to further his work at

1              P. Chung

2    KCG?

3         A.   Yes, because he didn't have

4    explicit authority, authorization to look at

5    those files.  There are ways to get that

6    access.  There are proper channels.  You go

7    to your manager.  You discuss it, you

8    discuss, you know, and you get permission.

9              MR. LIPMAN:  All right.  If we take

10             a quick break, I will either come back

11             with just a few questions or conclude

12             the deposition, of course leaving it

13             open because there are a lot of

14             documents that are yet to be produced it

15             seems.

16             MR. DUGAN:  Things aren't as they

17             seem, Harry, but I'm sure Zach will pump

18             out a letter tonight.

19             MR. LIPMAN:  I doubt it.

20             (Recess taken from 5:24 p.m. to

21             5:35 p.m.)

22        Q.   Mr. Chung, you testified that KCG

23   took a snapshot, I think that was your word,

24   of Mr. Khandekar's directory on or about

25   February 19th, 2017; is that right?

Page 242

1                    P. Chung

2      A.   Approximately, sure.

3      Q.   Did KCG determine when, if at all,

4   Mr. Khandekar actually opened any of the ▮▮▮

5   predictors on the list we were looking at

6   before?

7      A.   According to the Bash history, he

8   did.

9      Q.   When?  On what dates?

10     A.   Between the end of December through

11  February.  We can go to the specific Bash

12  history document if you want to be specific.

13     Q.   Was KCG able to determine whether

14  or not Mr. Khandekar opened any predictor

15  files prior to December 2017?

16          MR. DUGAN:  2016 you mean?

17     Q.   I'm sorry.  2016.  Right.

18     A.   We don't have any evidence of that.

19     Q.   And why is that?  Is that because

20  the Bash history doesn't exist, or you

21  determined that there was no attempt to open

22  documents prior to December 2016?

23     A.   We didn't see any evidence of it.

24  A lot of stuff, certainly snapshots roll off.

25  And so older files will -- we will lose older

1                    P. Chung

2       A.   No.

3       Q.   Why not?

4       A.   Again, with his experience and his

5  skill set, or skill level, merely looking at

6  the code would give him enough ideas to be

7  able to -- certainly compared to other folks,

8  other quants, to be able to reproduce those

9  predictors at a competitor.

10           MR. DUGAN:   Nothing further.

11  BY MR. LIPMAN:

12       Q.   Let me just ask you this.   If

13  Mr. Khandekar abided by his noncompete

14  agreement and abided by his agreement not to

15  share or disclose confidential information

16  with any third-parties, how could KCG or now

17  Virtu be harmed by Mr. Khandekar going to a

18  competitor?

19       A.   So given his resume and his

20  misrepresentation of knowing ███████████

21  ███████ predictors, it's evident to us that

22  his intent was to use that information at our

23  competitor, information that he was not privy

24  to when he was at KCG.

25       Q.   That doesn't answer my question,

Page 253

1           P. Chung

2   which is, if Mr. Khandekar was to -- well,

3   let me rephrase that.

4           My question is if Mr. Khandekar,

5   comma, having followed his noncompete now for

6   six months, stayed out of the competitive

7   workspace, and if he were to abide by his

8   confidentiality obligations, how could KCG be

9   harmed?  Do you understand the question?

10      A.   Yes.  If he abided by the

11  noncompete and abided by all the

12  confidentiality agreements at KCG, there

13  would be -- it would be considered that he

14  wasn't in violation of those things.  Was

15  not.

16      Q.   Right.  But my question is how

17  could KCG be harmed?

18      A.   Certainly losing a highly skilled

19  quant to a competitor is -- can be a

20  competitive disadvantage and could cause harm

21  in terms of profitability, you know, in terms

22  of competition.

23      Q.   Anything else?

24      A.   No.

25          MR. LIPMAN:  No more questions.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KCG HOLDINGS, INC. and KCG AMERICAS LLC, | ) ) ) |
| Plaintiffs, | ) Civil Action No. 17 CV 3533 ) (AJN) (GWG) |
| -against- | ) ) |
| ROHIT KHANDEKAR | ) ) |
| Defendant. | ) ) ) ) |

## ACKNOWLEDGEMENT OF DEPONENT

I, Philip Chung, do hereby certify that I have read the foregoing pages of the deposition of KCG Holdings, Inc. and KCG Americas LLC by Philip Chung taken on Wednesday, October 4, 2017 and the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, noted in the attached errata sheet.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 30, 2017

Philip Chung

1

| Page | Line | Now Reads | Should Read | Reason For Correction |
|------|------|-----------|-------------|-----------------------|
| 43 | 11 | For the record, loop is the | For the record, the Loop is the | capitalization |
| 43 | 12 | confluence | Confluence | capitalization |
| 43 | 13 | confluence incidents. | Confluence instances. | capitalization and word correction |
| 48 | 7 | I'm not aware of anybody sending | I'm not aware of anybody else sending | clearly I'm aware of Mr. Khandekar |
| 61 | 3 | could you explain. | could you explain? | punctuation |
| 61 | 4 | or at least repeat. | or at least repeat? | punctuation |
| 85 | 11 |  |  | file path correction |
| 85 | 12 | in a group force method | in a brute force method | word correction |
| 85 | 17 | etg/develop/bs | /etg/develop/bs | absolute path begins with '/' |
| 86 | 22 | home/users/rkhandek/store/docs/bs | /home/users/rkhandek/store/docs/bs | absolute path begins with '/' |
| 90 | 6 | was called short list | was called shortlist | file name has no space |
| 92 | 7 | etg/users/east/jchome | /etg/users/east/jc_home | absolute path begins with '/' ; jchome s.b. jc_home |
| 92 | 12 | in jchome are | in jc_home are | jchome s.b. jc_home |
| 93 | 23 | in the jchome directory | in the jc_home directory | jchome s.b. jc_home |
| 94 | 5 | underneath jchome | underneath jc_home | jchome s.b. jc_home |
| 94 | 10 | how's that. | how's that? | punctuation |
| 157 | 3 | by head of operations | my head of operations | word correction |
| 203 | 14 | chmodog-rwx | chmod og-rwx | correct Linux command syntax (add space) |
| 203 | 19 | gpg—output | gpg --output | correct Linux command syntax (add space) |
| 204 | 6 | gpg-output | gpg --output | correct Linux command syntax (add space, add dash) |
| 205 | 2 | gpg--output | gpg --output | correct Linux command syntax (add space) |
| 217 | 22 | the chamod command | the chmod command | correct Linux command spelling |
| 217 | 24 | chamod restriction | chmod restriction | correct Linux command spelling |